(Slip Opinion)     OCTOBER TERM, 2008     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CARCIERI, GOVERNOR OF RHODE ISLAND, ET AL. *v.* SALAZAR, SECRETARY OF THE INTERIOR, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 07–526.   Argued November 3, 2008—Decided February 24, 2009

The Indian Reorganization Act (IRA), enacted in 1934, authorizes the Secretary of Interior, a respondent here, to acquire land and hold it in trust "for the purpose of providing land for Indians," 25 U. S. C. §465, and defines "Indian" to "include all persons of Indian descent who are members of any recognized tribe now under Federal jurisdiction," §479.  The Narragansett Tribe was placed under the Colony of Rhode Island's formal guardianship in 1709.  It agreed to relinquish its tribal authority and sell all but two acres of its remaining reservation land in 1880, but then began trying to regain its land and tribal status.  From 1927 to 1937, federal authorities declined to give it assistance because they considered the Tribe to be under state, not federal jurisdiction.  In a 1978 agreement settling a dispute between the Tribe and Rhode Island, the Tribe received title to 1,800 acres of land in petitioner Charlestown in exchange for relinquishing claims to state land based on aboriginal title; and it agreed that the land would be subject to state law.  The Tribe gained formal recognition from the Federal Government in 1983, and the Secretary of Interior accepted a deed of trust to the 1,800 acres in 1988.  Subsequently, a dispute arose over whether the Tribe's plans to build housing on an additional 31 acres of land it had purchased complied with local regulations.  While litigation was pending, the Secretary accepted the 31-acre parcel into trust.  The Interior Board of Indian Appeals upheld that decision, and petitioners sought review. The District Court granted summary judgment to the Secretary and other officials, determining that §479's plain language defines "Indian" to include members of all tribes in existence in 1934, but does not require a tribe to have been federally recognized on that date; and concluding

that, since the Tribe is currently federally recognized and was in ex-
istence in 1934, it is a tribe under §479. In affirming, the First Cir-
cuit found §479 ambiguous as to the meaning of "now under Federal
jurisdiction," applied the principles of *Chevron U. S. A. Inc.* v. *Natu-
ral Resources Defense Council, Inc.*, 467 U. S. 837, 843, and deferred
to the Secretary's construction of the provision to allow the land to be
taken into trust.

*Held:* Because the term "now under federal jurisdiction" in §479 unam-
biguously refers to those tribes that were under federal jurisdiction
when the IRA was enacted in 1934, and because the Narragansett
Tribe was not under federal jurisdiction in 1934, the Secretary does
not have the authority to take the 31-acre parcel into trust. Pp. 7–16.

   (a) When a statute's text is plain and unambiguous, *United States*
v. *Gonzales*, 520 U. S. 1, 4, the statute must be applied according to
its terms, see, *e.g.*, *Dodd* v. *United States*, 545 U. S. 353, 359. Here,
whether the Secretary has authority to take the parcel into trust de-
pends on whether the Narragansetts are members of a "recognized
Indian Tribe now under Federal jurisdiction," which, in turn, depends
on whether "now" refers to 1998, when the Secretary accepted the
parcel into trust, or 1934, when Congress enacted the IRA. The ordi-
nary meaning of "now," as understood at the time of enactment, was
at "the present time; at this moment; at the time of speaking." That
definition is consistent with interpretations given "now" by this Court
both before and after the IRA's passage. See *e.g., Franklin* v. *United
States*, 216 U. S. 559, 569; *Montana* v. *Kennedy*, 366 U. S. 308, 310–
311. It also aligns with the word's natural reading in the context of
the IRA. Furthermore, the Secretary's current interpretation is at
odds with the Executive Branch's construction of §479 at the time of
enactment. The Secretary's additional arguments in support of his
contention that "now" is ambiguous are unpersuasive. There is also
no need to consider the parties' competing views on whether Con-
gress had a policy justification for limiting the Secretary's trust au-
thority to tribes under federal jurisdiction in 1934, since Congress'
use of "now" in §479 speaks for itself and "courts must presume that
a legislature says in a statute what it means and means in a statute
what it says there." *Connecticut Nat. Bank* v. *Germain*, 503 U. S.
249, 253–254. Pp. 7–13.

   (b) The Court rejects alternative arguments by the Secretary and
his *amici* that rely on statutory provisions other than §479 to support
the Secretary's decision to take the parcel into trust for the Narra-
gansetts. Pp. 13–15.

497 F. 3d 15, reversed.

   THOMAS, J., delivered the opinion of the Court, in which ROBERTS,

Syllabus

C. J., and SCALIA, KENNEDY, BREYER, and ALITO, JJ., joined. BREYER, J., filed a concurring opinion. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, J., joined. STEVENS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–526

_____

## DONALD L. CARCIERI, GOVERNOR OF RHODE ISLAND, ET AL., PETITIONERS *v.* KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[February 24, 2009]

JUSTICE THOMAS delivered the opinion of the Court.

The Indian Reorganization Act (IRA or Act) authorizes the Secretary of the Interior, a respondent in this case, to acquire land and hold it in trust "for the purpose of providing land for Indians." Ch. 576, §5, 48 Stat. 985, 25 U. S. C. §465. The IRA defines the term "Indian" to "include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." §479. The Secretary notified petitioners—the State of Rhode Island, its Governor, and the town of Charlestown, Rhode Island—that he intended to accept in trust a parcel of land for use by the Narragansett Indian Tribe in accordance with his claimed authority under the statute. In proceedings before the Interior Board of Indian Appeals (IBIA), the District Court, and the Court of Appeals for the First Circuit, petitioners unsuccessfully challenged the Secretary's authority to take the parcel into trust.

In reviewing the determination of the Court of Appeals, we are asked to interpret the statutory phrase "now under

Federal jurisdiction" in §479. Petitioners contend that the term "now" refers to the time of the statute's enactment, and permits the Secretary to take land into trust for members of recognized tribes that were "under Federal jurisdiction" in 1934. The respondents argue that the word "now" is an ambiguous term that can reasonably be construed to authorize the Secretary to take land into trust for members of tribes that are "under Federal jurisdiction" at the time that the land is accepted into trust.

We agree with petitioners and hold that, for purposes of §479, the phrase "now under Federal jurisdiction" refers to a tribe that was under federal jurisdiction at the time of the statute's enactment. As a result, §479 limits the Secretary's authority to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934. Because the record in this case establishes that the Narragansett Tribe was not under federal jurisdiction when the IRA was enacted, the Secretary does not have the authority to take the parcel at issue into trust. We reverse the judgment of the Court of Appeals.

I

At the time of colonial settlement, the Narragansett Indian Tribe was the indigenous occupant of much of what is now the State of Rhode Island. See Final Determination of Federal Acknowledgement of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177 (1983) (hereinafter Final Determination). Initial relations between colonial settlers, the Narragansett Tribe, and the other Indian tribes in the region were peaceful, but relations deteriorated in the late 17th century. The hostilities peaked in 1675 and 1676 during the 2-year armed conflict known as King Philip's War. Hundreds of colonists and thousands of Indians died. See E. Schultz & M. Tougias, King Philip's War 5 (1999). The Narragansett Tribe, having

been decimated, was placed under formal guardianship by the Colony of Rhode Island in 1709. 48 Fed. Reg. 6177.[1]

Not quite two centuries later, in 1880, the State of Rhode Island convinced the Narragansett Tribe to relinquish its tribal authority as part of an effort to assimilate tribal members into the local population. See *Narragansett Indian Tribe* v. *National Indian Gaming Comm'n*, 158 F. 3d 1335, 1336 (CADC 1998). The Tribe also agreed to sell all but two acres of its remaining reservation land for $5,000. *Ibid.* Almost immediately, the Tribe regretted its decisions and embarked on a campaign to regain its land and tribal status. *Ibid.* In the early 20th century, members of the Tribe sought economic support and other assistance from the Federal Government. But, in correspondence spanning a 10-year period from 1927 to 1937, federal officials declined their request, noting that the Tribe was, and always had been, under the jurisdiction of the New England States, rather than the Federal Government.

Having failed to gain recognition or assistance from the United States or from the State of Rhode Island, the Tribe filed suit in the 1970's to recover its ancestral land, claiming that the State had misappropriated its territory in violation of the Indian Non-Intercourse Act, 25 U. S. C. §177.[2] The claims were resolved in 1978 by enactment of the Rhode Island Indian Claims Settlement Act, 92 Stat. 813, 25 U. S. C. §1701 *et seq.* Under the agreement codi-

———————

[1] The Narragansett Tribe recognized today is the successor to two tribes, the Narragansett and the Niantic Tribes. The two predecessor Tribes shared territory and cultural traditions at the time of European settlement and effectively merged in the aftermath of King Philip's War. See Final Determination, 48 Fed. Reg. 6177.

[2] Title 25 U. S. C. §177 provides, in pertinent part, that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

fied by the Settlement Act, the Tribe received title to 1,800
acres of land in Charlestown, Rhode Island, in exchange
for relinquishing its past and future claims to land based
on aboriginal title. The Tribe also agreed that the 1,800
acres of land received under the Settlement Act "shall be
subject to the civil and criminal laws and jurisdiction of
the State of Rhode Island." §1708(a); see also §1712(a).

The Narragansett Tribe's ongoing efforts to gain recog-
nition from the United States Government finally suc-
ceeded in 1983. 48 Fed. Reg. 6177. In granting formal
recognition, the Bureau of Indian Affairs (BIA) determined
that "the Narragansett community and its predecessors
have existed autonomously since first contact, despite
undergoing many modifications." *Id.,* at 6178. The BIA
referred to the Tribe's "documented history dating from
1614" and noted that "all of the current membership are
believed to be able to trace to at least one ancestor on the
membership lists of the Narragansett community pre-
pared after the 1880 Rhode Island 'detribalization' act."
*Ibid.* After obtaining federal recognition, the Tribe began
urging the Secretary to accept a deed of trust to the 1,800
acres conveyed to it under the Rhode Island Indian Claims
Settlement Act. 25 CFR §83.2 (2008) (providing that
federal recognition is needed before an Indian tribe may
seek "the protection, services, and benefits of the Federal
government"). The Secretary acceded to the Tribe's re-
quest in 1988. See *Town of Charlestown, Rhode Island* v.
*Eastern Area Director, Bur. of Indian Affairs*, 18 IBIA 67,
69 (1989).[3]

In 1991, the Tribe's housing authority purchased an

––––––––

[3] The Tribe, the town, and the Secretary previously litigated issues
relating to the Secretary's acceptance of these 1,800 acres, and that
matter is not presently before this Court. See generally *Town of
Charlestown, Rhode Island,* 18 IBIA 67; *Rhode Island* v. *Narragansett
Indian Tribe*, 19 F. 3d 685 (CA1 1994); *Narragansett Indian Tribe* v.
*Rhode Island*, 449 F. 3d 16 (CA1 2006).

additional 31 acres of land in the town of Charlestown adjacent to the Tribe's 1,800 acres of settlement lands. Soon thereafter, a dispute arose about whether the Tribe's planned construction of housing on that parcel had to comply with local regulations. *Narragansett Indian Tribe* v. *Narragansett Elec. Co.*, 89 F. 3d 908, 911–912 (CA1 1996). The Tribe's primary argument for noncompliance— that its ownership of the parcel made it a "dependent Indian community" and thus "Indian country" under 18 U. S. C. §1151—ultimately failed. 89 F. 3d, at 913–922. But, while the litigation was pending, the Tribe sought an alternative solution to free itself from compliance with local regulations: It asked the Secretary to accept the 31-acre parcel into trust for the Tribe pursuant to 25 U. S. C. §465. By letter dated March 6, 1998, the Secretary notified petitioners of his acceptance of the Tribe's land into trust. Petitioners appealed the Secretary's decision to the IBIA, which upheld the Secretary's decision. See *Town of Charlestown, Rhode Island* v. *Eastern Area Director, Bureau of Indian Affairs*, 35 IBIA 93 (2000).

Petitioners sought review of the IBIA decision pursuant to the Administrative Procedure Act, 5 U. S. C. §702. The District Court granted summary judgment in favor of the Secretary and other Department of Interior officials. As relevant here, the District Court determined that the plain language of 25 U. S. C. §479 defines "Indian" to include members of all tribes in existence in 1934, but does not require a tribe to have been federally recognized on that date. *Carcieri* v. *Norton*, 290 F. Supp. 2d 167, 179–181 (RI 2003). According to the District Court, because it is currently "federally-recognized" and "existed at the time of the enactment of the IRA," the Narragansett Tribe "qualifies as an 'Indian tribe' within the meaning of §479." *Id.*, at 181. As a result, "the secretary possesses authority under §465 to accept lands into trust for the benefit of the Narragansetts." *Ibid.*

The Court of Appeals for the First Circuit affirmed, first in a panel decision, *Carcieri* v. *Norton*, 423 F. 3d 45 (2005), and then sitting en banc, 497 F. 3d 15 (CA1 2008). Although the Court of Appeals acknowledged that "[o]ne might have an initial instinct to read the word 'now' [in §479] . . . to mean the date of [the] enactment of the statute, June 18, 1934," the court concluded that there was "ambiguity as to whether to view the term . . . as operating at the moment Congress enacted it or at the moment the Secretary invokes it." *Id.*, at 26. The Court of Appeals noted that Congress has used the word "now" in other statutes to refer to the time of the statute's application, not its enactment. *Id.*, at 26–27. The Court of Appeals also found that the particular statutory context of §479 did not clarify the meaning of "now." On one hand, the Court of Appeals noted that another provision within the IRA, 25 U. S. C. §472, uses the term "now or hereafter," which supports petitioners' argument that "now," by itself, does not refer to future events. But on the other hand, §479 contains the particular application date of "June 1, 1934," suggesting that if Congress had wanted to refer to the date of enactment, it could have done so more specifically. 497 F. 3d, at 27. The Court of Appeals further reasoned that both interpretations of "now" are supported by reasonable policy explanations, *id.*, at 27–28, and it found that the legislative history failed to "clearly resolve the issue," *id.*, at 28.

Having found the statute ambiguous, the Court of Appeals applied the principles set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984), and deferred to the Secretary's construction of the provision. 497 F. 3d, at 30. The court rejected petitioners' arguments that the Secretary's interpretation was an impermissible construction of the statute. *Id.*, at 30–34. It also held that petitioners had failed to demonstrate that the Secretary's interpretation was inconsistent

with earlier practices of the Department of Interior. Furthermore, the court determined that even if the interpretation were a departure from the Department's prior practices, the decision should be affirmed based on the Secretary's "reasoned explanation for his interpretation." *Id.*, at 34.

We granted certiorari, 552 U. S. \_\_\_ (2008), and now reverse.

## II

This case requires us to apply settled principles of statutory construction under which we must first determine whether the statutory text is plain and unambiguous. *United States* v. *Gonzales*, 520 U. S. 1, 4 (1997). If it is, we must apply the statute according to its terms. See, *e.g.*, *Dodd* v. *United States*, 545 U. S. 353, 359 (2005); *Lamie* v. *United States Trustee*, 540 U. S. 526, 534 (2004); *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.*, 530 U. S. 1, 6 (2000); *Caminetti* v. *United States*, 242 U. S. 470, 485 (1917).

The Secretary may accept land into trust only for "the purpose of providing land for Indians." 25 U. S. C. §465. "Indian" is defined by statute as follows:

> "The term 'Indian' as used in this Act shall include all persons of Indian descent who are *members of any recognized Indian tribe now under Federal jurisdiction*, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. . . . The term 'tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. . . ." §479 (emphasis added).

The parties are in agreement, as are we, that the Secre-

tary's authority to take the parcel in question into trust depends on whether the Narragansetts are members of a "recognized Indian Tribe now under Federal jurisdiction." *Ibid.* That question, in turn, requires us to decide whether the word "now under Federal jurisdiction" refers to 1998, when the Secretary accepted the 31-acre parcel into trust, or 1934, when Congress enacted the IRA.

We begin with the ordinary meaning of the word "now," as understood when the IRA was enacted. *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267, 272 (1994); *Moskal* v. *United States*, 498 U. S. 103, 108–109 (1990). At that time, the primary definition of "now" was "[a]t the present time; at this moment; at the time of speaking." Webster's New International Dictionary 1671 (2d ed. 1934); see also Black's Law Dictionary 1262 (3d ed. 1933) (defining "now" to mean "[a]t this time, or at the present moment" and noting that "'[n]ow' as used in a statute *ordinarily* refers to the date of its taking effect . . ." (emphasis added)). This definition is consistent with interpretations given to the word "now" by this Court, both before and after passage of the IRA, with respect to its use in other statutes. See, *e.g.*, *Franklin* v. *United States*, 216 U. S. 559, 568–569 (1910) (interpreting a federal criminal statute to have "adopted such punishment as the laws of the State in which such place is situated *now* provide for the like offense" (citing *United States* v. *Paul*, 6 Pet. 141 (1832) (internal quotation marks omitted))); *Montana* v. *Kennedy*, 366 U. S. 308, 310–311 (1961) (interpreting a statute granting citizenship status to foreign-born "children of persons who *now* are, or have been citizens of the United States" (internal quotation marks omitted; emphasis deleted)).

It also aligns with the natural reading of the word within the context of the IRA. For example, in the original version of 25 U. S. C. §465, which provided the same authority to the Secretary to accept land into trust for "the

purpose of providing land for Indians," Congress explicitly referred to current events, stating "[t]hat no part of such funds shall be used to acquire additional land outside of the exterior boundaries of [the] Navajo Indian Reservation . . . in the event that the proposed Navajo boundary extension measures *now* pending in Congress . . . become law." IRA, §5, 48 Stat. 985 (emphasis added).[4]   In addition, elsewhere in the IRA, Congress expressly drew into the statute contemporaneous *and* future events by using the phrase "now or hereafter."  See 25 U. S. C. §468 (referring to "the geographic boundaries of any Indian reservation now existing or established hereafter"); §472 (referring to "Indians who may be appointed . . . to the various positions maintained, now or hereafter, by the Indian Office"). Congress' use of the word "now" in this provision, without the accompanying phrase "or hereafter," thus provides further textual support for the conclusion that the term refers solely to events contemporaneous with the Act's enactment.  See *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks omitted)).

Furthermore, the Secretary's current interpretation is at odds with the Executive Branch's construction of this provision at the time of enactment.  In correspondence with those who would assist him in implementing the IRA, the Commissioner of Indian Affairs, John Collier, explained that:

--------

[4]The current version of §465 provides "[t]hat no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation . . . in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law."

"Section 19 of the Indian Reorganization Act of June 18, 1934 (48 Stat. L., 988), provides, in effect, that the term 'Indian' as used therein shall include—(1) all persons of Indian descent who are members of any recognized tribe *that was under Federal jurisdiction at the date of the Act . . . .*" Letter from John Collier, Commissioner, to Superintendents (Mar. 7, 1936), Lodging of Respondents (emphasis added).[5]

Thus, although we do not defer to Commissioner Collier's interpretation of this unambiguous statute, see *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992), we agree with his conclusion that the word "now" in §479 limits the definition of "Indian," and therefore limits the exercise of the Secretary's trust authority under §465 to those members of tribes that were under federal jurisdiction at the time the IRA was enacted.

The Secretary makes two other arguments in support of his contention that the term "now" as used in §479 is ambiguous. We reject them both. First, the Secretary

—————

[5] In addition to serving as Commissioner of Indian Affairs, John Collier was "a principal author of the [IRA]." *United States* v. *Mitchell*, 463 U. S. 206, 221, n. 21 (1983). And, as both parties note, he appears to have been responsible for the insertion of the words "now under Federal jurisdiction" into what is now 25 U. S. C. §479. See Hearings on S. 2755 et al.: A Bill to Grant Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise, before the Senate Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 2, p. 266 (1934). Also, the record contains a 1937 letter from Commissioner Collier in which, even after the passage of the IRA, he stated that the Federal Government still lacked any jurisdiction over the Narragansett Tribe. App. 23a–24a. Commissioner Collier's responsibilities related to implementing the IRA make him an unusually persuasive source as to the meaning of the relevant statutory language and the Tribe's status under it. See *Christensen* v. *Harris County*, 529 U. S. 576, 587 (2000) (explaining that an Executive Branch statutory interpretation that lacks the force of law is "entitled to respect . . . to the extent that those interpretations have the 'power to persuade'" (internal quotation marks omitted)).

argues that although the "use of 'now' can refer to the time of enactment" in the abstract, "it can also refer to the time of the statute's application." Brief for Respondents 18. But the susceptibility of the word "now" to alternative meanings "does not render the word . . . whenever it is used, ambiguous," particularly where "all but one of the meanings is ordinarily eliminated by context." *Deal* v. *United States*, 508 U. S. 129, 131–132 (1993). Here, the statutory context makes clear that "now" does not mean "now or hereafter" or "at the time of application." Had Congress intended to legislate such a definition, it could have done so explicitly, as it did in §§468 and 472, or it could have omitted the word "now" altogether. Instead, Congress limited the statute by the word "now" and "we are obliged to give effect, if possible, to every word Congress used." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979).

Second, the Secretary argues that §479 left a gap for the agency to fill by using the phrase "shall include" in its introductory clause. Brief for Respondents 26–27. The Secretary, in turn, claims to have permissibly filled that gap by defining "'Tribe'" and "'Individual Indian'" without reference to the date of the statute's enactment. *Id.,* at 28 (citing 25 CFR §§151.2(b), (c)(1) (2008)). But, as explained above, Congress left no gap in 25 U. S. C. §479 for the agency to fill. Rather, it explicitly and comprehensively defined the term by including only three discrete definitions: "[1] members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . . [3] all other persons of one-half or more Indian blood." *Ibid.* In other statutory provisions, Congress chose to expand the Secretary's authority to particular Indian tribes not necessarily encompassed

within the definitions of "Indian" set forth in §479.[6]  Had it
understood the word "include" in §479 to encompass tribes
other than those satisfying one of the three §479 defini-
tions, Congress would have not needed to enact these
additional statutory references to specific Tribes.

   The Secretary and his *amici* also go beyond the statu-
tory text to argue that Congress had no policy justification
for limiting the Secretary's trust authority to those tribes
under federal jurisdiction in 1934, because the IRA was
intended to strengthen Indian communities as a whole,
regardless of their status in 1934.  Petitioners counter that
the main purpose of §465 was to reverse the loss of lands
that Indians sustained under the General Allotment Act,
see *Atkinson Trading Co.* v. *Shirley*, 532 U. S. 645, 650,
n. 1 (2001), so the statute was limited to tribes under
federal jurisdiction at that time because they were the
tribes who lost their lands.  We need not consider these
competing policy views, because Congress' use of the word
"now" in §479 speaks for itself and "courts must presume
that a legislature says in a statute what it means and
means in a statute what it says there."  *Connecticut Nat.
Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992).[7]

--------

   [6] See, *e.g.*, 25 U. S. C. §473a ("Sections . . . 465 . . . and 479 of this title
shall after May 1, 1936, apply to the Territory of Alaska"); §1041e(a)
("The [Shawnee] Tribe shall be eligible to have land acquired in trust
for its benefit pursuant to section 465 of this title . . ."); §1300b–14(a)
("[Sections 465 and 479 of this title are] hereby made applicable to the
[Texas] Band [of Kickapoo Indians] . . ."); §1300g–2(a) ("[Sections 465
and 479] shall apply to the members of the [Ysleta Del Ser Pueblo]
tribe, the tribe, and the reservation").

   [7] Because we conclude that the language of §465 unambiguously pre-
cludes the Secretary's action with respect to the parcel of land at issue
in this case, we do not address petitioners' alternative argument that
the Rhode Island Indian Claims Settlement Act, 92 Stat. 813, 25
U. S. C. §1701 *et seq.*, precludes the Secretary from exercising his
authority under §465.

### III

The Secretary and his supporting *amici* also offer two alternative arguments that rely on statutory provisions other than the definition of "Indian" in §479 to support the Secretary's decision to take this parcel into trust for the Narragansett Tribe. We reject both arguments.

First, the Secretary and several *amici* argue that the definition of "Indian" in §479 is rendered irrelevant by the broader definition of "tribe" in §479 and by the fact that the statute authorizes the Secretary to take title to lands "in the name of the United States in trust for the *Indian tribe* or individual Indian for which the land is acquired." §465 (emphasis added); Brief for Respondents 12–14. But the definition of "tribe" in §479 itself refers to "any *Indian* tribe" (emphasis added), and therefore is limited by the temporal restrictions that apply to §479's definition of "Indian." See §479 ("The term 'tribe' wherever used in this Act shall be construed to refer to any *Indian* tribe, organized band, pueblo, or the Indians residing on one reservation" (emphasis added)). And, although §465 authorizes the United States to take land in trust for an Indian tribe, §465 limits the Secretary's exercise of that authority "for the purpose of providing land for Indians." There simply is no legitimate way to circumvent the definition of "Indian" in delineating the Secretary's authority under §§ 465 and 479. [8]

––––––––––

[8] For this reason, we disagree with the argument made by JUSTICE STEVENS that the term "Indians" in §465 has a different meaning than the definition of "Indian" provided in §479, and that the term's meaning in §465 is controlled by later-enacted regulations governing the Secretary's recognition of tribes like the Narragansetts. See *post*, at 4–6, 9–11 (dissenting opinion). When Congress has enacted a definition with "detailed and unyielding provisions," as it has in §479, this Court must give effect to that definition even when "'it could be argued that the line should have been drawn at a different point.'" *INS* v. *Hector*, 479 U. S. 85, 88–89 (1986) *(per curium)* (quoting *Fiallo* v. *Bell*, 430 U. S. 787, 798 (1977)).

Second, *amicus* National Congress of American Indians (NCAI) argues that 25 U. S. C. §2202, which was enacted as part of the Indian Land Consolidation Act (ILCA), Title II, 96 Stat. 2517, overcomes the limitations set forth in §479 and, in turn, authorizes the Secretary's action. Section 2202 provides:

> "The provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of section 478 of this title: *Provided*, That nothing in this section is intended to supersede any other provision of Federal law which authorizes, prohibits, or restricts the acquisition of land for Indians with respect to any specific tribe, reservation, or state(s)." (Alteration in original.)

NCAI argues that the "ILCA independently grants authority under Section 465 for the Secretary to execute the challenged trust acquisition." NCAI Brief 8. We do not agree.

The plain language of §2202 does not expand the power set forth in §465, which requires that the Secretary take land into trust only "for the purpose of providing land for Indians." Nor does §2202 alter the definition of "Indian" in §479, which is limited to members of tribes that were under federal jurisdiction in 1934.[9] See *supra*, at 7–12. Rather, §2202 by its terms simply ensures that tribes may benefit from §465 even if they opted out of the IRA pursuant to §478, which allowed tribal members to reject the application of the IRA to their tribe. §478 ("This Act shall

----

[9] NCAI notes that the ILCA's definition of "tribe" "means any Indian tribe, band, group, pueblo, or community for which, or for the members of which, the United States holds lands in trust." §2201. But §2201 is, by its express terms, applicable only to Chapter 24 of Title 25 of the United States Code. *Ibid.* The IRA is codified in Chapter 14 of Title 25. See §465. Section 2201, therefore, does not itself alter the authority granted to the Secretary by §465.

not apply to any reservation wherein a majority of the adult Indians . . . shall vote against its application"). As a result, there is no conflict between §2202 and the limitation on the Secretary's authority to take lands contained in §465. Rather, §2202 provides additional protections to those who satisfied the definition of "Indian" in §479 at the time of the statute's enactment, but opted out of the IRA shortly thereafter.

NCAI's reading of §2202 also would nullify the plain meaning of the definition of "Indian" set forth in §479 and incorporated into §465. Consistent with our obligation to give effect to every provision of the statute, *Reiter*, 442 U. S., at 339, we will not assume that Congress repealed the plain and unambiguous restrictions on the Secretary's exercise of trust authority in §§465 and 479 when it enacted §2202. "We have repeatedly stated . . . that absent 'a clearly expressed congressional intention,' . . . [a]n implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch* v. *Smith*, 538 U. S. 254, 273 (2003) (plurality opinion) (quoting *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974), and *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936)).

## IV

We hold that the term "now under Federal jurisdiction" in §479 unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934. None of the parties or *amici*, including the Narragansett Tribe itself, has argued that the Tribe was under federal jurisdiction in 1934. And the evidence in the record is to the contrary. 48 Fed. Reg. 6177. Moreover, the petition for writ of certiorari filed in this case specifically represented that "[i]n 1934, the Narragansett Indian Tribe . . . was neither federally rec-

ognized nor under the jurisdiction of the federal government." Pet. for Cert. 6. The respondents' brief in opposition declined to contest this assertion. See Brief in Opposition 2–7. Under our rules, that alone is reason to accept this as fact for purposes of our decision in this case. See this Court's Rule 15.2. We therefore reverse the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–526

DONALD L. CARCIERI, GOVERNOR OF RHODE ISLAND, ET AL., PETITIONERS *v.* KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[February 24, 2009]

JUSTICE BREYER, concurring.

I join the Court's opinion with three qualifications. *First*, I cannot say that the statute's language by itself is determinative. Linguistically speaking, the word "now" in the phrase "now under Federal jurisdiction," 25 U. S. C. §479, may refer to a tribe's jurisdictional status as of 1934. But one could also read it to refer to the time the Secretary of the Interior exercises his authority to take land "for Indians." §465. Compare *Montana* v. *Kennedy*, 366 U. S. 308, 311–312 (1961) ("now" refers to time of statutory enactment), with *Difford* v. *Secretary of HHS*, 910 F. 2d 1316, 1320 (CA6 1990) ("now" refers to time of exercise of delegated authority); *In re Lusk's Estate*, 336 Pa. 465, 467–468, 9 A. 2d 363, 365 (1939) (property "now" owned refers to property owned when a will becomes operative). I also concede that the Court owes the Interior Department the kind of interpretive respect that reflects an agency's greater knowledge of the circumstances in which a statute was enacted, cf. *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944). Yet because the Department then favored the Court's present interpretation, see *infra*, at 2, that respect cannot help the Department here.

Neither can *Chevron U. S. A. Inc.* v. *Natural Resources*

*Defense Council, Inc.*, 467 U. S. 837 (1984), help the De-
partment. The scope of the word "now" raises an interpre-
tive question of considerable importance; the provision's
legislative history makes clear that Congress focused
directly upon that language, believing it definitively re-
solved a specific underlying difficulty; and nothing in that
history indicates that Congress believed departmental
expertise should subsequently play a role in fixing the
temporal reference of the word "now." These circum-
stances indicate that Congress did not intend to delegate
interpretive authority to the Department. Consequently,
its interpretation is not entitled to *Chevron* deference,
despite linguistic ambiguity. See *United States* v. *Mead
Corp.*, 533 U. S. 218, 227, 229–230 (2001).

*Second,* I am persuaded that "now" means "in 1934" not
only for the reasons the Court gives but also because an
examination of the provision's legislative history convinces
me that Congress so intended. As I read that history, it
shows that Congress expected the phrase would make
clear that the Secretary could employ §465's power to take
land into trust in favor only of those tribes in respect to
which the Federal Government already had the kinds of
obligations that the words "under Federal jurisdiction"
imply. See Hearings on S. 2755 et al.: A Bill to Grant to
Indians Living Under Federal Tutelage the Freedom to
Organize for Purposes of Local Self-Government and
Economic Enterprise, before the Senate Committee on
Indian Affairs, 73d Cong., 2d Sess., pt. 2, pp. 263–266
(1934). Indeed, the very Department official who sug-
gested the phrase to Congress during the relevant legisla-
tive hearings subsequently explained its meaning in terms
that the Court now adopts. See Letter from John Collier,
Commissioner, to Superintendents (Mar. 7, 1936), Lodging
of Respondents (explaining that §479 included "persons of
Indian descent who are members of any recognized tribe
that was under Federal jurisdiction at the date of the

Act").

*Third*, an interpretation that reads "now" as meaning "in 1934" may prove somewhat less restrictive than it at first appears. That is because a tribe may have been "under Federal jurisdiction" in 1934 even though the Federal Government did not believe so at the time. We know, for example, that following the Indian Reorganization Act's enactment, the Department compiled a list of 258 tribes covered by the Act; and we also know that it wrongly left certain tribes off the list. See Brief for Law Professors Specializing in Federal Indian Law as *Amicus Curiae* 22–24; Quinn, Federal Acknowledgment of American Indian Tribes: The Historical Development of a Legal Concept, 34 Am. J. Legal Hist. 331, 356–359 (1990). The Department later recognized some of those tribes on grounds that showed that it should have recognized them in 1934 even though it did not. And the Department has sometimes considered that circumstance sufficient to show that a tribe was "under Federal jurisdiction" in 1934— even though the Department did not know it at the time.

The statute, after all, imposes no time limit upon recognition. See §479 ("The term 'Indian' . . . shall include all persons of Indian descent who are members of *any recognized* Indian tribe now under Federal jurisdiction . . ." (emphasis added)). And administrative practice suggests that the Department has accepted this possibility. The Department, for example, did not recognize the Stillaguamish Tribe until 1976, but its reasons for recognition in 1976 included the fact that the Tribe had maintained treaty rights against the United States since 1855. Consequently, the Department concluded that land could be taken into trust for the Tribe. See Memorandum from Associate Solicitor, Indian Affairs to Assistant Secretary, Indian Affairs, Request for Reconsideration of Decision Not to Take Land in Trust for the Stillaguamish Tribe (Oct. 1, 1980), Lodging of Respondents 6–7. Similarly, in

1934 the Department thought that the Grand Traverse Band of Ottawa and Chippewa Indians had long since been dissolved. *Grand Traverse Band of Ottawa & Chippewa Indians* v. *Office of U. S. Attorney for Western Dist. of Mich.*, 369 F. 3d 960, 961, and n. 2 (CA6 2004). But later the Department recognized the Tribe, considering it to have existed continuously since 1675. 45 Fed. Reg. 19321 (1980). Further, the Department in the 1930's thought that an anthropological study showed that the Mole Lake Tribe no longer existed. But the Department later decided that the study was wrong, and it then recognized the Tribe. See Memorandum from the Solicitor to the Commissioner of Indian Affairs 2758, 2762–2763 (Feb. 8, 1937) (recognizing the Mole Lake Indians as a separate tribe).

In my view, this possibility—that later recognition reflects earlier "Federal jurisdiction"—explains some of the instances of early Department administrative practice to which JUSTICE STEVENS refers. I would explain the other instances to which JUSTICE STEVENS refers as involving the taking of land "for" a tribe with members who fall under that portion of the statute that defines "Indians" to include "persons of one-half or more Indian blood," §479. See 1 Dept. of Interior, Opinions of the Solicitor Relating to Indian Affairs, 1917–1974, pp. 706–707 (Shoshone Indians), 724–725 (St. Croix Chippewas), 747–748 (Nahma and Beaver Indians) (1979).

Neither the Narragansett Tribe nor the Secretary has argued that the Tribe was under federal jurisdiction in 1934. Nor have they claimed that any member of the Narragansett Tribe satisfies the "one-half or more Indian blood" requirement. And I have found nothing in the briefs that suggests the Narragansett Tribe could prevail on either theory. Each of the administrative decisions just discussed involved post-1934 recognition on grounds that implied a 1934 relationship between the tribe and

Federal Government that could be described as jurisdictional, for example, a treaty with the United States (in effect in 1934), a (pre-1934) congressional appropriation, or enrollment (as of 1934) with the Indian Office. I can find no similar indication of 1934 federal jurisdiction here. Instead, both the State and Federal Government considered the Narragansett Tribe as under *state,* but not under *federal,* jurisdiction in 1934. And until the 1970's there was "little Federal contact with the Narragansetts as a group." Memorandum from Deputy Assistant Secretary—Indian Affairs (Operations) to Assistant Scretary—Indian Affairs, Recommendation and Summary of Evidence for Proposed Finding for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island Pursuant to 25 CFR 83, p. 8 (July 29, 1982). Because I see no realistic possibility that the Narragansett Tribe could prevail on the basis of a theory alternative to the theories argued here, I would not remand this case.

With the qualifications here expressed, I join the Court's opinion and its judgment.

# SUPREME COURT OF THE UNITED STATES

No. 07–526

DONALD L. CARCIERI, GOVERNOR OF RHODE
ISLAND, ET AL., PETITIONERS *v.* KEN L.
SALAZAR, SECRETARY OF THE
INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[February 24, 2009]

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

Save as to one point, I agree with JUSTICE BREYER's concurring opinion, which in turn concurs with the opinion of the Court, subject to the three qualifications JUSTICE BREYER explains. I have, however, a further reservation that puts me in the dissenting column.

The disposition of the case turns on the construction of the language from 25 U. S. C. §479, "any recognized Indian tribe now under Federal jurisdiction." Nothing in the majority opinion forecloses the possibility that the two concepts, recognition and jurisdiction, may be given separate content. As JUSTICE BREYER makes clear in his concurrence, the statute imposes no time limit upon recognition, and in the past, the Department of the Interior has stated that the fact that the United States Government was ignorant of a tribe in 1934 does not preclude that tribe from having been under federal jurisdiction at that time. See Memorandum from Associate Solicitor, Indian Affairs, to Assistant Secretary, Indian Affairs, Request for Reconsideration of Decision Not to Take Land in Trust for the Stillaguamish Tribe (Oct. 1, 1980), Lodging of Respondents 7. And giving each phrase its own

meaning would be consistent with established principles of statutory interpretation.

During oral argument, however, respondents explained that the Secretary's more recent interpretation of this statutory language had "understood recognition and under Federal jurisdiction at least with respect to tribes to be one and the same." Tr. of Oral Arg. 42. Given the Secretary's position, it is not surprising that neither he nor the Tribe raised a claim that the Tribe was under federal jurisdiction in 1934: they simply failed to address an issue that no party understood to be present. The error was shared equally all around, and there is no equitable demand that one side be penalized when both sides nodded.

I can agree with JUSTICE BREYER that the current record raises no particular reason to expect that the Tribe might be shown to have been under federal jurisdiction in 1934, but I would not stop there. The very notion of jurisdiction as a distinct statutory condition was ignored in this litigation, and I know of no body of precedent or history of practice giving content to the condition sufficient for gauging the Tribe's chances of satisfying it. So I see no reason to deny the Secretary and the Narragansett Tribe an opportunity to advocate a construction of the "jurisdiction" phrase that might favor their position here.

I would therefore reverse and remand with opportunity for respondents to pursue a "jurisdiction" claim and respectfully dissent from the Court's straight reversal.*

———————
　*Depending on the outcome of proceedings on remand, it might be necessary to address the second potential issue in this case, going to the significance of the Rhode Island Indian Claims Settlement Act, 25 U. S. C. §1701 *et seq.* There is no utility in confronting it now.

# SUPREME COURT OF THE UNITED STATES

————

No. 07–526

————

DONALD L. CARCIERI, GOVERNOR OF RHODE
ISLAND, ET AL., PETITIONERS *v.* KEN L.
SALAZAR, SECRETARY OF THE
INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[February 24, 2009]

JUSTICE STEVENS, dissenting.

Congress has used the term "Indian" in the Indian Reorganization Act of 1934 to describe those individuals who are entitled to special protections and benefits under federal Indian law. The Act specifies that benefits shall be available to individuals who qualify as Indian either as a result of blood quantum or as descendants of members of "any recognized Indian tribe now under Federal jurisdiction." 25 U. S. C. §479. In contesting the Secretary of the Interior's acquisition of trust land for the Narragansett Tribe of Rhode Island, the parties have focused on the meaning of "now" in the Act's definition of "Indian." Yet to my mind, whether "now" means 1934 (as the Court holds) or the present time (as respondents would have it) sheds no light on the question whether the Secretary's actions on behalf of the Narragansett were permitted under the statute. The plain text of the Act clearly authorizes the Secretary to take land into trust for Indian tribes as well as individual Indians, and it places no temporal limitation on the definition of "Indian tribe."[1] Because the Narra-

————

[1] In 25 U. S. C. §479, Congress defined both "Indian" and "tribe." Section 479 states, in relevant part:

gansett Tribe is an Indian tribe within the meaning of the
Act, I would affirm the judgment of the Court of Appeals.

I

This case involves a challenge to the Secretary of the
Interior's acquisition of a 31-acre parcel of land in
Charlestown, Rhode Island, to be held in trust for the
Narragansett Tribe.[2]  That Tribe has existed as a continu-
ous political entity since the early 17th century.  Although
it was once one of the most powerful tribes in New Eng-
land, a series of wars, epidemics, and difficult relations
with the State of Rhode Island sharply reduced the Tribe's
ancestral landholdings.

Two blows, delivered centuries apart, exacted a particu-
larly high toll on the Tribe.  First, in 1675, King Philip's
War essentially destroyed the Tribe, forcing it to accept
the Crown as sovereign and to submit to the guardianship
of the Colony of Rhode Island.  Then, in 1880, the State of
Rhode Island passed a "detribalization" law that abolished
tribal authority, ended the State's guardianship of the

——————

"The term 'Indian' as used in this Act shall include all persons of
Indian descent who are members of any recognized Indian tribe now
under Federal jurisdiction, and all persons who are descendants of such
members who were, on June 1, 1934, residing within the present
boundaries of any Indian reservation, and shall further include
all other persons of one-half or more Indian blood. . . . The term
'tribe' wherever used in this Act shall be construed to refer to
any Indian tribe, organized band, pueblo, or the Indians residing on one
reservation."

Notably the word "now," which is used to define one of the categories
of Indians, does not appear in the definition of "tribe."

[2] In 1991, the Narragansett Tribe purchased the 31-acre parcel in fee
simple from a private developer.  In 1998, the Bureau of Indian Affairs
notified the State of the Secretary's decision to take the land into
unreserved trust for the Tribe.  The Tribe "acquired [the land] for the
express purpose of building much needed low-income Indian Housing
via a contract between the Narragansett Indian Wetuomuck Housing
Authority (NIWHA) and the Department of Housing and Urban Devel-
opment (HUD)."  App. 46a.

Tribe, and attempted to sell all tribal lands. The Narragansett originally assented to detribalization and ceded all but two acres of its ancestral land. In return, the Tribe received $5,000. See Memorandum from the Deputy Assistant Secretary-Indian Affairs (Operations) to Assistant Secretary-Indian Affairs (Operations) 4 (July 19, 1982) (Recommendation for Acknowledgment).

Recognizing that its consent to detribalization was a mistake, the Tribe embarked on a century-long campaign to recoup its losses.[3] Obtaining federal recognition was critical to this effort. The Secretary officially recognized the Narragansett as an Indian tribe in 1983, Final Determination for Federal Acknowledgement of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177, and with that recognition the Tribe qualified for the bundle of federal benefits established in the Indian Reorganization Act of 1934 (IRA or Act),[4] 25 U. S. C. §461 *et seq.* The Tribe's attempt to exercise one of those rights, the ability to petition the Secretary to take land into trust for the Tribe's benefit, is now vigorously contested in this litigation.

## II

The Secretary's trust authority is located in 25 U. S. C.

---

[3] Indeed, this litigation stems in part from the Tribe's suit against (and subsequent settlement with) Rhode Island and private landowners on the ground that the 1880 sale violated the Indian Non-Intercourse Act of June 30, 1834, ch. 161, §12, 4 Stat. 730 (25 U. S. C. §177), which prohibited sales of tribal land without "treaty or convention entered into pursuant to the Constitution."

[4] The IRA was the cornerstone of the Indian New Deal. "The intent and purpose of the [IRA] was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'" *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 152 (1973) (quoting H. R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934)). See generally F. Cohen, Handbook of Federal Indian Law §1.05 (2005) (hereinafter Cohen); G. Taylor, The New Deal and American Indian Tribalism: The Administration of the Indian Reorganization Act, 1934–45 (1980).

§465. That provision grants the Secretary power to take "in trust for [an] Indian tribe or individual Indian" "any interest in lands . . . for the purpose of providing land for Indians."[5]   The Act's language could not be clearer: To effectuate the Act's broad mandate to revitalize tribal development and cultural self-determination, the Secretary can take land into trust for a tribe or he can take land into trust for an individual Indian.

Though Congress outlined the Secretary's trust authority in §465, it specified which entities would be considered "tribes" and which individuals would qualify as "Indian" in §479.  An individual Indian, §479 tells us, "shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction" as well as "all other persons of one-half or more Indian blood."  A tribe, §479 goes on to state, "shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation."  Because federal recognition is generally required before a tribe can receive federal benefits, the Secretary has interpreted this definition of "tribe" to refer only to recognized tribes.  See 25 CFR §83.2 (2008) (stating that recognition "is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes"); §151.2 (defining "tribe" for the purposes

⎯⎯⎯⎯⎯⎯

[5] Section 465 reads more fully:

"The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.

.          .          .          .          .

"Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation."

of land acquisition to mean "any Indian tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians, . . . which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs").[6]

Having separate definitions for "Indian" and "tribe" is essential for the administration of IRA benefits. The statute reflects Congress' intent to extend certain benefits to individual Indians, *e.g.*, 25 U. S. C. §471 (offering loans to Indian students for tuition at vocational and trade schools); §472 (granting hiring preferences to Indians seeking federal employment related to Indian affairs), while directing other benefits to tribes, *e.g.*, §476 (allowing tribes to adopt constitutions and bylaws); §470 (giving loans to Indian-chartered corporations).

Section 465, by giving the Secretary discretion to steer benefits to tribes and individuals alike, is therefore unique. But establishing this broad benefit scheme was undoubtedly intentional: The original draft of the IRA presented to Congress directed the Secretary to take land into trust only for entities such as tribes. Compare H. R. 7902, 73d Cong., 2d Sess., 30 (1934) ("Title to any land acquired pursuant to the provisions of this section shall be taken in the name of the United States in trust *for the Indian tribe or community for whom the land is acquired*" (emphasis added)), with 25 U. S. C. §465 ("Title to any lands or rights acquired pursuant to this Act . . . shall be

———————

[6] The regulations that govern the tribal recognition process, 25 CFR §83 *et seq.* (2008), were promulgated pursuant to the President's general mandate established in the early 1830's to manage "all Indian affairs and . . . all matters arising out of Indian relations," 25 U. S. C. §2, and to "prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs," §9. Thus, contrary to the argument pressed by the Governor of Rhode Island before this Court, see Reply Brief for Petitioner Carcieri 9, the requirement that a tribe be federally recognized before it is eligible for trust land does not stem from the IRA.

taken in the name of the United States in trust *for the Indian tribe or individual Indian for which the land is acquired*" (emphasis added)).

The Secretary has long exercised his §465 trust author-ity in accordance with this design.  In the years immedi-ately following the adoption of the IRA, the Solicitor of the Department of the Interior repeatedly advised that the Secretary could take land into trust for federally recog-nized tribes and for individual Indians who qualified for federal benefits by lineage or blood quantum.

For example, in 1937, when evaluating whether the Secretary could purchase approximately 2,100 acres of land for the Mole Lake Chippewa Indians of Wisconsin, the Solicitor instructed that the purchase could not be "completed until it is determined whether the beneficiary of the trust title should be designated as a band or whether the title should be taken for the individual Indi-ans in the vicinity of Mole Lake who are of one half or more Indian blood."  Memorandum from the Solicitor to the Commissioner of Indian Affairs 2758 (Feb. 8, 1937). Because the Mole Lake Chippewa was not yet recognized by the Federal Government as an Indian tribe, the Solici-tor determined that the Secretary had two options: "Either the Department should provide recognition of this group, or title to the purchased land should be taken on behalf of the individuals who are of one half or more Indian blood." *Id.*, at 2763.

The tribal trust and individual trust options were simi-larly outlined in other post-1934 opinion letters, including those dealing with the Shoshone Indians of Nevada, the St. Croix Chippewa Indians of Wisconsin, and the Nahma and Beaver Island Indians of Michigan.  See 1 Dept. of Interior, Opinions of the Solicitor Relating to Indian Af-fairs, 1917–1974, pp. 706–707, 724–725, 747–748 (1979). Unless and until a tribe was formally recognized by the Federal Government and therefore eligible for trust land,

the Secretary would take land into trust for individual Indians who met the blood quantum threshold.

Modern administrative practice has followed this well-trodden path. Absent a specific statute recognizing a tribe and authorizing a trust land acquisition,[7] the Secretary has exercised his trust authority—now governed by regulations promulgated in 1980 after notice-and-comment rulemaking, 25 CFR §151 *et seq.;* 45 Fed. Reg. 62034—to acquire land for federally recognized Indian tribes like the Narragansett. The Grand Traverse Band of Ottowa and Chippewa Indians, although denied federal recognition in 1934 and 1943, see Dept. of Interior, Office of Federal Acknowledgement, Memorandum from Acting Deputy Commissioner to Assistant Secretary 4 (Oct. 3, 1979) (GTB–V001–D002), was the first tribe the Secretary recognized under the 1980 regulations, see 45 Fed. Reg. 19322. Since then, the Secretary has used his trust authority to expand the Tribe's land base. See, *e.g.*, 49 Fed. Reg. 2025–2026 (1984) (setting aside a 12.5-acre parcel as reservation land for the Tribe's exclusive use). The Tu-

_____

[7] Although Congress has passed specific statutes granting the Secretary authority to take land into trust for certain tribes, it would be a mistake to conclude that the Secretary lacks residual authority to take land into trust under 25 U. S. C. §465 of the IRA. Some of these statutes place explicit limits on the Secretary's trust authority and can be properly read as establishing the outer limit of the Secretary's trust authority with respect to the specified tribes. See, *e.g.*, §1724(d) (authorizing trust land for the Houlton Band of Maliseet Indians, the Passamaquoddy Tribe of Maine, and the Penobscot Tribe of Maine). Other statutes, while identifying certain parcels the Secretary will take into trust for a tribe, do not purport to diminish the Secretary's residual authority under §465. See, *e.g.*, §1775c(a) (Mohegan Tribe); §1771d (Wampanoag Tribe); §1747(a) (Miccosukee Tribe). Indeed, the Secretary has invoked his §465 authority to take additional land into trust for the Miccosukee Tribe despite the existence of a statute authorizing and directing him to acquire certain land for the Tribe. See Post-Argument En Banc Brief for National Congress of American Indians et al. as *Amici Curiae* 7 and App. 9 in No. 03–2647 (CA1).

nica-Biloxi Tribe of Louisiana has similarly benefited from
administrative recognition, 46 Fed. Reg. 38411 (1981),
followed by tribal trust acquisition. And in 2006, the
Secretary took land into trust for the Snoqualmie Tribe
which, although unrecognized as an Indian tribe in the
1950's, regained federal recognition in 1999. See 71 Fed.
Reg. 5067 (taking land into trust for the Tribe); 62 Fed.
Reg. 45864 (1997) (recognizing the Snoqualmie as an
Indian tribe).

This brief history of §465 places the case before us into
proper context. Federal recognition, regardless of when it
is conferred, is the necessary condition that triggers a
tribe's eligibility to receive trust land. No party has dis-
puted that the Narragansett Tribe was properly recog-
nized as an Indian tribe in 1983. See 48 Fed. Reg. 6177.
Indeed, given that the Tribe has a documented history
that stretches back to 1614 and has met the rigorous
criteria for administrative recognition, Recommendation
for Acknowledgment 1, 7–18, it would be difficult to sus-
tain an objection to the Tribe's status. With this in mind,
and in light of the Secretary's longstanding authority
under the plain text of the IRA to acquire tribal trust land,
it is perfectly clear that the Secretary's land acquisition
for the Narragansett was entirely proper.

## III

Despite the clear text of the IRA and historical pedigree
of the Secretary's actions on behalf of the Narragansett,
the majority holds that one word ("now") nestled in one
clause in one of §479's several definitions demonstrates
that the Secretary acted outside his statutory authority in
this case. The consequences of the majority's reading are
both curious and harsh: curious because it turns "now"
into the most important word in the IRA, limiting not only
some individuals' eligibility for federal benefits but also a
tribe's; harsh because it would result in the unsupportable

conclusion that, despite its 1983 administrative recognition, the Narragansett Tribe is not an Indian tribe under the IRA.

In the Court's telling, when Congress granted the Secretary power to acquire trust land "for the purpose of providing land for *Indians*," 25 U. S. C. §465 (emphasis added), it meant to permit land acquisitions for those persons whose tribal membership qualify them as "Indian" as defined by §479. In other words, the argument runs, the Secretary can acquire trust land for "persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." §479. This strained construction, advanced by petitioners, explains the majority's laser-like focus on the meaning of "now": If the Narragansett Tribe was not recognized or under federal jurisdiction in 1934, the Tribe's members do not belong to an Indian tribe "now under Federal jurisdiction" and would therefore not be "Indians" under §465 by virtue of their tribal membership.

Petitioners' argument works only if one reads "Indians" (in the phrase in §465 "providing land for Indians") to refer to individuals, not an Indian tribe. To petitioners, this reading is obvious; the alternative, they insist, would be "nonsensical." Reply Brief for Petitioner State of Rhode Island 3. This they argue despite the clear evidence of Congress' intent to provide the Secretary with the option of acquiring either tribal trusts or individual trusts in service of "providing land for Indians." And they ignore unambiguous evidence that Congress used "Indian tribe" and "Indians" interchangeably in other parts of the IRA. See §475 (discussing "any claim or suit of any *Indian tribe* against the United States" in the first sentence and "any claim of such *Indians* against the United States" in the last sentence (emphasis added)).

In any event, this much must be admitted: Without the benefit of context, a reasonable person could conclude that "Indians" refers to multiple individuals who each qualify

as "Indian" under the IRA. An equally reasonable person could also conclude that "Indians" is meant to refer to a collective, namely, an Indian tribe. Because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 132 (2000), the proper course of action is to widen the interpretive lens and look to the rest of the statute for clarity. Doing so would lead to §465's last sentence, which specifies that the Secretary is to hold land in trust "for the Indian tribe or individual Indian for which the land is acquired." Put simply, in §465 Congress used the term "Indians" to refer both to tribes and individuals.[8]

The majority nevertheless dismisses this reading of the statute. The Court notes that even if the Secretary has authority to take land into trust for a tribe, it must be an "*Indian* tribe," with §479's definition of "Indian" determining a tribe's eligibility. The statute's definition of "tribe," the majority goes on to state, itself makes reference to "Indian tribe." Thus, the Court concludes, "[t]here simply is no legitimate way to circumvent the definition of 'Indian' in delineating the Secretary's authority under §479." *Ante*, at 13.

The majority bypasses a straightforward explanation on its way to a circular one. Requiring that a tribe be an "Indian tribe" does not demand immediate reference to the definition of "Indian"; instead, it simply reflects the requirement that the tribe in question be formally recognized as an Indian tribe. As explained above, the Secretary has limited benefits under federal Indian law— including the acquisition of trust land—to recognized

————————

[8] The majority continues to insist, quite incorrectly, that Congress meant the term "Indians" in §465 to have the same meaning as the term "Indian" in §479. That the text of the statute tells a different story appears to be an inconvenience the Court would rather ignore.

tribes. Recognition, then, is the central requirement for being considered an "Indian tribe" for purposes of the Act. If a tribe satisfies the stringent criteria established by the Secretary to qualify for federal recognition, including the requirement that the tribe prove that it "has existed as a community from historical times until the present," 25 CFR §83.7(b) (2008), it is *a fortiori* an "Indian tribe" as a matter of law.

The Narragansett Tribe is no different. In 1983, upon meeting the criteria for recognition, the Secretary gave notice that "the Narragansett Indian Tribe . . . exists as an *Indian tribe*." 48 Fed. Reg. 6177 (emphasis added). How the Narragansett could be an Indian tribe in 1983 and yet not be an Indian tribe today is a proposition the majority cannot explain.

The majority's retort, that because "tribe" refers to "Indian," the definition of "Indian" must control which groups can be considered a "tribe," is entirely circular. Yes, the word "tribe" is defined in part by reference to "Indian tribe." But the word "Indian" is also defined in part by reference to "Indian tribe." Relying on one definition to provide content to the other is thus "completely circular and explains nothing." *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U. S. 318, 323 (1992).

The Governor of Rhode Island, for his part, adopts this circular logic and offers two examples of why reading the statute any other way would be implausible. He first argues that if §479's definition of "Indian" does not determine a tribe's eligibility, the Secretary would have authority to take land into trust "for the benefit of any group that he deems, at his whim and fancy, to be an 'Indian tribe.'" Reply Brief for Petitioner Carcieri 7. The Governor caricatures the Secretary's discretion. This Court has long made clear that Congress—and therefore the Secretary—lacks constitutional authority to "bring a community or body of people within [federal jurisdiction] by arbitrarily calling

them an Indian tribe." *United States* v. *Sandoval*, 231
U. S. 28, 46 (1913).  The Governor's next objection, that
condoning the acquisition of trust land for the Narragan-
sett Tribe would allow the Secretary to acquire land for an
Indian tribe that lacks Indians, is equally unpersuasive.
As a general matter, to obtain federal recognition, a tribe
must demonstrate that its "membership consists of indi-
viduals who descend from a historical Indian tribe or from
historical Indian tribes which combined and functioned as
a single autonomous political entity."  25 CFR §83.7(e)
(2008).  If the Governor suspects that the Narragansett is
not an Indian tribe because it may lack members who are
blood quantum Indians, he should have challenged the
Secretary's decision to recognize the Tribe in 1983 when
such an objection could have been properly received.[9]

———————

[9] The Department of the Interior found "a high degree of retention of
[Narragansett] family lines" between 1880 and 1980, and remarked
that "[t]he close intermarriage and stability of composition, plus the
geographic stability of the group, reflect the maintenance of a socially
distinct community."  Recommendation for Acknowledgment 10.  It also
noted that the Narragansett "require applicants for full voting mem-
bership to trace their Narragansett Indian bloodlines back to the
'Detribalization Rolls of 1880–84.'"  *Id.*, at 16.  The record in this case
does not tell us how many members of the Narragansett currently
qualify as "Indian" by meeting the individual blood quantum require-
ment.  Indeed, it is possible that a significant number of the Narragan-
sett are blood quantum Indians.  Accordingly, nothing the Court
decides today prevents the Secretary from taking land into trust for
those members of the Tribe who independently qualify as "Indian"
under 25 U. S. C. §479.

Although the record does not demonstrate how many members of the
Narragansett qualify as blood quantum Indians, JUSTICE BREYER
nevertheless assumes that no member of the Tribe is a blood quantum
Indian.  *Ante*, at 4 (concurring opinion).  This assumption is misguided
for two reasons.  To start, the record's silence on this matter is to be
expected; the parties have consistently focused on the Secretary's
authority to take land into trust for the Tribe, not for individual mem-
bers of the Tribe.  There is thus no legitimate basis for interpreting the
lack of record evidence as affirmative proof that none of the Tribe's

In sum, petitioners' arguments—and the Court's conclu-sion—are based on a misreading of the statute. "[N]ow," the temporal limitation in the definition of "Indian," only affects an individual's ability to qualify for federal benefits under the IRA. If this case were about the Secretary's decision to take land into trust for an individual who was incapable of proving her eligibility by lineage or blood quantum, I would have no trouble concluding that such an action was contrary to the IRA. But that is not the case before us. By taking land into trust for a validly recog-nized Indian tribe, the Secretary acted well within his statutory authority.[10]

## IV

The Court today adopts a cramped reading of a statute Congress intended to be "sweeping" in scope. *Morton* v. *Mancari*, 417 U. S. 535, 542 (1974). In so doing, the Court ignores the "principle deeply rooted in [our] Indian juris-prudence" that "'statutes are to be construed liberally in favor of the Indians.'" *County of Yakima* v. *Confederated*

---

members are "Indian." Second, neither the statute nor the relevant regulations mandate that a tribe have a threshold amount of blood quantum Indians as members in order to receive trust land. JUSTICE BREYER's unwarranted assumption about the Narragansett's member-ship, even if true, would therefore also be irrelevant to whether the Secretary's actions were proper.

[10] Petitioners advance the additional argument that the Secretary lacks authority to take land into trust for the Narragansett because the Rhode Island Indian Claims Settlement Act, 92 Stat. 813, 25 U. S. C. §1701 *et seq*., implicitly repealed the Secretary's §465 trust authority as applied to lands in Rhode Island. This claim plainly fails. While the Tribe agreed to subject the 1,800 acres it obtained in the Settlement Act to the State's civil and criminal laws, §1708(a), the 31-acre parcel of land at issue here was not part of the settlement lands. And, critically, nothing in the text of the Settlement Act suggests that Con-gress intended to prevent the Secretary from acquiring additional parcels of land in Rhode Island that would be exempt from the State's jurisdiction.

*Tribes and Bands of Yakima Nation*, 502 U. S. 251, 269 (1992) (quoting *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 767–768 (1985)); see also Cohen §2.02[1], p. 119 ("The basic Indian law canons of construction require that treaties, agreements, statutes, and executive orders be liberally construed in favor of the Indians").

Given that the IRA plainly authorizes the Secretary to take land into trust for an Indian tribe, and in light of the Narragansett's status as such, the Court's decision can be best understood as protecting one sovereign (the State) from encroachment from another (the Tribe). Yet in matters of Indian law, the political branches have been entrusted to mark the proper boundaries between tribal and state jurisdiction. See U. S. Const., Art. I, §8, cl. 3; *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 192 (1989); *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832). With the IRA, Congress drew the boundary in a manner that favors the Narragansett. I respectfully dissent.