Filed 10/13/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| UNITED AUBURN INDIAN COMMUNITY OF THE AUBURN RANCHERIA,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>EDMUND G. BROWN, JR., as Governor, etc.,<br><br>    Defendant and Respondent. | C075126<br><br>(Super. Ct. No. 34-2013-80001412CUWMGDS ) |

APPEAL from a judgment of the Superior Court of Sacramento County, Eugene L. Balonon, Judge. Affirmed.

Bingham McCutchen, Morgan, Lewis & Bockius, Thomas F. Gede and Colin C. West for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Sara J. Drake, Senior Assistant Attorney General, William P. Torngren and Timothy M. Muscat, Deputy Attorneys General for Defendant and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.

1

The federal Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.; hereafter IGRA) permits gaming on Indian lands taken into trust for the benefit of a tribe after October 17, 1988, if the Secretary of the Interior (Secretary) inter alia determines it would be in the best interest of the tribe and would not be detrimental to the surrounding community, and the governor of the state in which the land is located concurs with the determination. (25 U.S.C. § 2719(b)(1)(A).) IGRA requires a tribal-state compact for the conduct of class III gaming (casino-style gaming), and California law designates the Governor as the state officer authorized to negotiate and execute the compact. (25 U.S.C. § 2710(d)(3)(A); Cal. Const., art. IV, § 19, subd. (f).)

A competing Indian tribe challenges the validity of the Governor's concurrence on the ground it constituted an illegal exercise of legislative power, which was neither delegated to the Governor, nor ancillary and incidental to his power to enter into gaming compacts with Indian tribes. We disagree on the ground the exercise of the power of concurrence is not legislative. Because we conclude concurrence is not a legislative power, we need not determine whether it is ancillary and incidental to the Governor's power to enter into gaming compacts.

The land in question is in Yuba County. The Governor gave his concurrence and simultaneously executed a tribal-state gaming compact for the Yuba County site. The competing gaming establishment, the plaintiff and appellant, is owned by the United Auburn Indian Community of the Auburn Rancheria (Auburn Tribe). The Auburn Tribe also argues the Governor's concurrence was a project subject to the California Environmental Quality Act (CEQA). The concurrence was not a project under CEQA because the Governor is not a public agency.

This case involves the interplay of three separate statutory schemes--two federal and one state. First, section 465 of title 25 of the United States Code, which is now cited as section 5108, is part of the Indian Reorganization Act of 1934 (25 U.S.C. § 5101 et

seq.; hereafter IRA).  This section provides that the Secretary "is . . . authorized . . . to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians."  (25 U.S.C. § 5108.)

The second statutory scheme is IGRA.  (25 U.S.C. § 2701 et seq.)  IGRA was enacted for the express purpose of regulating gaming on Indian lands.  (25 U.S.C. § 2702.)  Two IGRA statutes are pertinent here.  Section 2719 provides that gaming shall not be conducted on lands acquired by the Secretary for the benefit of a tribe after October 17, 1988, *unless* the Secretary makes a determination that gaming on such newly acquired lands would be in the best interest of the tribe and would not be detrimental to the surrounding community and "*the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.*"  (25 U.S.C. § 2719(b)(1)(A), italics added; *id.* § 2719(a).)  Section 2710(d)(1)(B) & (C) provides that class III gaming (casino-style gaming) is lawful only if:  (1) it is "located in a State that permits such gaming for any purpose by any person, organization, or entity" and (2) is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect."  The aforesaid paragraph (3) provides in pertinent part:  "Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.  Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  (25 U.S.C. § 2710(d)(3)(A).)

The third statutory scheme is California's, and includes the California Constitution.  Article IV, section 19, subdivision (f) of the California Constitution provides in part that notwithstanding any other provision of state law, "the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of [class III gaming] by federally recognized Indian tribes on Indian

3

lands in California in accordance with federal law."  Likewise, Government Code section 12012.5, subdivision (d) designates the Governor as the "state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes in the State of California pursuant to the Federal Indian Gaming Regulatory Act of 1988 . . . for the purpose of authorizing class III gaming, as defined in that act, on Indian lands."

The Auburn Tribe argues that even though federal law singles out the Governor as the arm of the state that must concur in the Secretary's determination under IGRA that land acquired after 1988 is suitable for Indian gaming, no state law authorizes the Governor to so act.  The Auburn Tribe maintains that such action is a legislative act that must be performed by the Legislature unless delegated to the Governor.  The Auburn Tribe argues that the Governor's power to concur with the Secretary's determination that land acquired after 1988 is suitable for gaming, is not necessary to the Governor's authority to negotiate and conclude class III gaming compacts.  Therefore, it argues the power to concur cannot be said to be ancillary or incidental to the Governor's legislative authorization to enter into class III gaming compacts with Indian tribes.  It claims that since the power to concur was a legislative act that was not expressly given to the Governor and which cannot be said to be ancillary and incidental to the compacting power, the Governor violated the separation of powers clause of the state Constitution when he concurred in the Secretary's determination that the land was suitable for Indian gaming.  (Cal. Const., art. III, § 3.)

We take issue with the Auburn Tribe's underlying premise that the power to concur in the Secretary's determination is clearly a legislative power.  "The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch."  (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297 (*Carmel Valley*.)  The Legislature's core function is to pass statutes.  (Cal. Const., art. IV, § 8; *Perez v. Roe 1*

4

(2006) 146 Cal.App.4th 171, 177.) Nothing about the Governor's concurrence defeated or materially impaired this function. As we will explain, the lines between the three branches of government are not always clearly defined, and some powers may not strictly belong to any one branch. (*People ex rel. Attorney Gen. v. Provines* (1868) 34 Cal. 520, 540-541 (conc. opn. of Sawyer, C.J.).) The Governor's power to concur has the characteristics of an executive, rather than a legislative act, thus the Governor's power does not depend on legislative delegation.

We shall conclude the Governor's concurrence did not violate the separation of powers clause. We also conclude that the concurrence is not a project under CEQA because the Governor is not a public agency. We shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2002 the Enterprise Rancheria of Maidu Indians of California (Enterprise Tribe) submitted a request to the United States Department of the Interior (Department) to acquire a site in Yuba County for the purpose of establishing a casino/hotel resort complex. Pursuant to the IRA, the Secretary is authorized to acquire land, within or without an existing reservation, for the purpose of providing land for Indians. (25 U.S.C. § 5108.) Title to such land is taken in the name of the United States in trust for the tribe for which the land is acquired, and the land is thereafter exempt from state and local taxation. (*Ibid*.) Land so acquired after October 17, 1988, may not, with some exceptions, be used for gaming. (25 U.S.C. § 2719.) The exception at issue here is where the Secretary "after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." (25 U.S.C. § 2719(b)(1)(A).) We shall refer to such land as post-1988 tribal land.

5

In 2005, after the Enterprise Tribe submitted its request to the Department, the Department commenced its environmental review of the project under the National Environmental Policy Act (NEPA).  The federal environmental review was completed in 2010.  The final environmental impact statement (FEIS) identified a number of significant environmental impacts that might result from the project.  Nevertheless, in 2011 the Assistant Secretary for Indian Affairs (Assistant Secretary) at the Department notified the Governor that he had made a favorable determination as required by section 2719(b)(1)(A) of IGRA.  (25 U.S.C. § 2719(b)(1)(A).)  In other words, he had determined that a gaming establishment on newly acquired lands would be in the best interest of the tribe and its members, and would not be detrimental to the surrounding community.  (*Ibid.*)

The Governor indicated his official concurrence with the Assistant Secretary's determination by letter dated August 30, 2012.  The same day, the Governor executed a tribal-state gaming compact between the state and the Enterprise Tribe with regard to the Yuba County site.  The Governor is designated by the California Constitution and by statute as the "state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes . . . pursuant to [IGRA] for the purpose of authorizing class III gaming . . . on Indian lands."  (Gov. Code, § 12012.5, subd. (d); Cal. Const., art. IV, §19, subd. (f).)

Plaintiff Auburn Tribe owns and operates the Thunder Valley Resort and Casino, which is approximately 20 miles from the Yuba County site.  The Auburn Tribe filed a petition for writ of mandate and complaint for declaratory relief.  The petition and complaint contained two causes of action.  The first alleged that the Governor was required to comply with CEQA before concurring in the Secretary's decision to take lands into trust for the Enterprise Tribe.  The second alleged the Governor performed a legislative act when he concurred with the Secretary and when he negotiated and

6

executed the compact with the Enterprise Tribe, in violation of the constitutional mandate of separation of powers.

The Governor demurred to the complaint, and the trial court sustained the demurrer without leave to amend. The trial court found that neither the Governor's concurrence, nor his negotiation and execution of the compact violated the separation of powers doctrine. The court found that the power to concur with the Secretary's determination was "ancillary and incidental" to the power granted to him by the state Constitution and by statute to negotiate and execute tribal-state gaming compacts. The trial court found the Governor's concurrence was not subject to CEQA because it was not a project pursuant to CEQA, and because the Governor is not a public agency. The trial court entered a judgment of dismissal, and the Auburn Tribe appealed.

DISCUSSION

I
Separation of Powers

Article III, section 3 of the California Constitution provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." "The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch." (*Carmel Valley*, *supra*, 25 Cal.4th at p. 297.)

Although the Constitution places limits on each branch of government with respect to the other branches, "the separation of powers principle does not command 'a hermetic sealing off of the three branches of Government from one another.' [Citation.]" (*Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 338.) "The doctrine . . . recognizes that the three branches of government are interdependent, and it permits actions of one branch that may 'significantly affect those of another branch.' [Citation.]" (*Carmel Valley*, *supra*, 25 Cal.4th at p. 298.) "The purpose of the doctrine is to prevent

7

one branch of government from exercising the *complete* power constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch. [Citation.]" (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 117.) The standard for evaluating the separation of powers clause is whether, from a realistic and practical perspective, the action of one branch defeats or materially impairs the core zone of constitutional authority of another branch. (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 45.)

The core constitutional function of the Legislature is to make laws by passing statutes. (Cal. Const., art. IV, § 8; *Perez v. Roe 1, supra,* 146 Cal.App.4th at p. 177.) Included in the core legislative function of making statutory law, is the power to weigh competing interests and determine social policy. (*Perez v. Roe 1*, at p. 177.) Nothing about the Governor's concurrence in the Secretary's finding defeated or materially impaired this function. As we shall explain, the act of concurrence is not clearly a legislative function.

A. The Governor's Authority Regarding Indian Gaming

Congress has the sole power to acquire land for the federal government, and it is constitutionally empowered to acquire land in trust for Indian tribes. (*Confederated Tribes of Siletz Indians v. United States* (9th Cir. 1997) 110 F.3d 688, 694.) Congress has delegated its power to acquire land in trust for Indian tribes to the Secretary, who "is . . . authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians." (25 U.S.C. § 5108.)

However, Congress conditioned the ability of the Secretary to take land into trust for Indian tribes for the purpose of gaming after October 17, 1988, upon the concurrence

8

of the Governor. Acquisition of land after that date is prohibited except, inter alia, where the Secretary makes a determination "that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community," and the Governor concurs in this determination. (25 U.S.C. § 2719(b)(1)(A).) This provision is part of IGRA, which Congress adopted expressly for the purpose of regulating the conduct of gaming on Indian lands. (25 U.S.C. § 2701.)

Additionally, Congress required as part of IGRA that class III gaming be conducted in conformance with a compact entered into between the tribe and the state in which the gaming is to be conducted. (25 U.S.C. § 2710(d)(1)(C).) In California, the authority to enter into such gaming compacts has been delegated by the legislative body to the Governor, with the power to ratify the compact reserved to the Legislature. Accordingly, "the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f).) The Governor is also designated by statute as the "state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes . . . pursuant to [IGRA] for the purpose of authorizing class III gaming . . . on Indian lands." (Gov. Code, § 12012.5, subd. (d).)

Federal law nominates the Governor as the state representative with the power to concur in the Secretary's determination to take land in trust for gaming. (25 U.S.C. § 2719(b).) Even though federal law controls the acquisition of land for Indian tribes and regulates the conduct of gaming--both on pre- and post-1988 tribal land--the Ninth Circuit has held that the Governor's power to concur emanates from state, rather than federal law. (*Confederated Tribes of Siletz Indians v. United States, supra*, 110 F.3d at pp. 697-698.) In response to an argument that the Governor's power to concur violated

9

the appointments clause of the federal Constitution,[1] the court stated:  "When the Governor exercises authority under IGRA, the Governor is exercising state authority.  If the Governor concurs, or refuses to concur, it is as a State executive, under the authority of state law.  The concurrence (or lack thereof) is given effect under federal law, but the authority to act is provided by state law.  . . . . No doubt, federal law provides the Governor with an opportunity to participate in the determination of whether gaming will be allowed on newly acquired trust land.  But when the Governor responds to the Secretary's request for a concurrence, the Governor acts under state law, as a state executive, pursuant to state interests.  The Governor does not act with 'significant authority' under federal law."  (*Ibid*.)

The Auburn Tribe prefaces its separation of powers argument by claiming that while the Legislature violates the separation of powers clause only when it materially impairs the executive branch's constitutional functions, the Governor's power is much more restricted.  The Governor, it claims, violates the separation of powers clause whenever he or she acts in excess of powers expressly delegated by the Constitution or by statute.  Apparently, the Auburn Tribe would have us believe that the Governor possesses no power other than that expressly given to him by the Legislature.  The Auburn Tribe cites two cases, neither of which supports this argument.

---

[1]    "The Constitution provides that the President shall appoint 'all . . . Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by Law. . . .'  U.S. Const. art. II, § 2, cl. 2.  Persons 'who are not appointed . . . and who therefore can not be considered "Officers of the United States" may not discharge functions that are properly discharged only by officers.'  [*United States ex rel. Kelly v.*] *Boeing* [*Co.* (9th Cir. 1993)] 9 F.3d [743,] 757.  The Appointments Clause serves as a guard against one branch aggrandizing its power at the expense of another branch, and preserves constitutional integrity by preventing the diffusion of appointment power.  *Freytag v. Commissioner of Internal Revenue* [(1991)] 501 U.S. 868, 878 [115 L.Ed.2d. 764]."  (*Confederated Tribes of Siletz Indians v. United States, supra,* 110 F.3d at p. 696.)

*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078 (*Harbor*), involved the Governor's constitutional power to veto bills and to veto "items of appropriation while approving other portions of a bill" (Cal. Const., art. IV, § 10, subd. (e); *id.,* subd. (a).) The Supreme Court recognized that since the time of George Washington, it has been understood that an executive must either approve a bill in its entirety, or veto it. (*Harbor,* at p. 1086.) An executive's power to veto legislation is so limited because the ability to selectively choose some, but not all parts of a bill to veto is inherently legislative, because it would permit the executive to affirmatively legislate. (*Ibid.*) In California, the Constitution expands the Governor's power to veto parts of a bill, but only if such part is an item of appropriation. (*Ibid.*)

Thus, when the court indicated the Governor could "act only as the Constitution allows," (*Harbor, supra*, 43 Cal.3d at p. 1087) it was because the partial veto power is legislative, and the California Constitution authorized only a narrow expansion of the veto power, i.e., the power to veto a portion of legislation only if it is an item of appropriation. As the court stated, when the Governor exercises the veto power, he acts as a " 'legislative instrumentality.' " (*Ibid.*) Any further expansion of a partial veto power without constitutional authority would have infringed on the legislative power, and was for this reason outside the Governor's power. Thus, the case supports an argument that the Governor has no power to perform a legislative function absent express authority, but it does not support an argument that the Governor has no power at all unless the power is expressly given by the Constitution or by statute.

Likewise, in *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 (*Professional Engineers*), the issue was whether the Governor could, as a result of a fiscal emergency, impose mandatory furloughs on represented state employees. The court stated that it was "well established" that the Legislature, not the Governor, possesses the ultimate authority to establish and revise the terms and conditions of state employment through legislative enactment, although the Legislature

11

may delegate its authority to the executive. (*Id*. at p. 1015.) The power is legislative because the Constitution gives the power to establish and revise the terms and conditions of state employment to the Legislature. (*Ibid*.)

Accordingly, the scope of the Governor's authority over represented employees was governed by the Dills Act, which provided that the terms and conditions of employment for such employees were governed by the provisions of the applicable Memorandums of Understanding (MOU). (*Professional Engineers*, *supra*, 50 Cal.4th at pp. 1038-1040.) The Governor could not unilaterally change the terms and conditions of employment covered by an MOU. (*Id*. at p. 1040.) The case did not stand for the proposition that the Governor has no power other than the power expressly given him or her by the Constitution or by statute. Instead, it held the particular power claimed by the Governor, the unilateral decision to furlough represented state employees, was a legislative power that was circumscribed by statute and ultimately limited by the applicable MOU terms.

These cases stand for the unremarkable proposition that the Governor may not exercise a legislative power without express authority from the Legislature. They do not hold that a Governor has no inherent authority without express statutory or constitutional authority. Thus, in determining whether the Governor violated the separation of powers clause, our task is to determine whether the power was legislative or executive in nature.

B. Concurrence Is Not Clearly Legislative

"The characteristics of many powers and duties are so marked that there can be no difficulty in determining whether they belong to the Legislative, Executive or Judicial Departments of the Government. But the lines between the several departments are not defined with precision, and there are other powers and duties that partake of the nature of duties pertaining to more than one of these departments, and may as properly be referred to one as the other, or may not strictly belong to either." (*People ex rel. Attorney Gen. v.*

12

*Provines, supra*, 34 Cal. at pp. 540-541 (conc. opn. of Sawyer, C.J.).) The power to concur in the Secretary's determination is such a power.

The Auburn Tribe argues the Governor's act of concurring with the Secretary's determination to take land into trust for the Enterprise Tribe was a legislative act because it set state policy. It argues the Governor's concurrence made land use policy, made tax policy, and made the policy decision to participate in IGRA. The Auburn Tribe argues the Governor's concurrence effectively made land use policy when it determined gaming could be conducted on the land. It argues the concurrence made tax policy by removing the land from the tax base. It claims the decision to participate in a federal program is a legislative act, and that the decision to participate in IGRA may only be authorized by the Legislature.

1. Participation in IGRA

Addressing the last argument first, the Auburn Tribe cites two published Attorney General opinions for the proposition that the decision to participate in a federal program is a legislative act over which the Legislature has exclusive power. (62 Ops.Cal.Atty.Gen. 781, 784 (1979); 65 Ops.Cal.Atty.Gen. 467, 469 (1982).) It claims the federal program in which the Governor decided to participate was IGRA. However, the Governor did not make the decision to participate in IGRA, because the Legislature had already decided to participate in IGRA.

IGRA provides in part that in order for an Indian tribe to conduct class III gaming activities on its lands, the state in which the lands are located must permit such gaming, and such gaming must be conducted in conformance with a tribal-state compact entered into with the state.[2] (25 U.S.C. § 2710(d)(1)(B) & (C).) The electorate, acting as the

---

[2] Class III gaming "includes such things as slot machines, casino games, banking card games, dog racing, and lotteries." (*Seminole Tribe v. Florida* (1996) 517 U.S. 44, 48 [134 L.Ed.2d 252, 261], fn. omitted.)

13

legislative body approved an initiative measure amending article IV, section 19 of the California Constitution to provide that "the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." Additionally, the Legislature enacted Government Code section 12012.5, subdivision (d) which states: "The Governor is the designated state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes in the State of California pursuant to the federal Indian Gaming Regulatory Act of 1988 (18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) for the purpose of authorizing class III gaming, as defined in that act, on Indian lands."

Thus, the Legislature has made the decision to participate in IGRA. The Governor's concurrence in the Secretary's decision to take the land into trust for the purpose of gaming pursuant to section 2719(b)(1)(A) of title 25 of the United States Code is only one part of a federal program in which the Legislature has made the policy decision to participate. The Governor did not create state policy by performing his role in the federal program.

2. Land Use Policy

The Auburn Tribe argues that in concurring with the Secretary's determination, the Governor was setting land use policy by allowing land to be used for gaming that had not previously been used for gaming. However, the mere fact that the Governor's concurrence had some land use consequences and involved a policymaking component, does not make the action a legislative function. The Auburn Tribe cites two cases to support this argument, neither of which is on point.

*Arnel Dev. Co. v. Costa Mesa* (1980) 28 Cal. 3d 511, 522-523, held that *zoning ordinances* make land use policy and are therefore legislative in nature. *Arnel* concerned

14

an initiative ordinance that rezoned a 67.6-acre piece of property to single-family residential, after the city had approved a plan rezoning the property to a higher density, and approved a plan that would allow 127 single family residences and 539 apartment units on the property. (*Id*. at p. 515.) In response to the development company's argument that the initiative ordinance was invalid because it was adjudicative in nature since the size and number of parcels affected were small, the Supreme Court held that regardless of size, a zoning ordinance is a legislative act. (*Id*. at pp. 515, 523-525.) The court distinguished zoning ordinances, which make land use policy, from such decisions as variances and subdivision map approvals, which apply land use policy and are adjudicative in character. (*Id*. at pp. 523-524.)

*Mira Development Corp. v. City of San Diego* (1988) 205 Cal.App.3d 1201, 1213-1217, also cited by the Auburn Tribe, held that the city's denial of an application to rezone property was a legislative act that could be overturned only if it had no reasonable relation to the public welfare.

These cases stand for the proposition that zoning ordinances are legislative in nature because they make land use law. Ordinances passed by local bodies are legislative in the sense that they are the equivalent of statutes passed by the state legislature. The cited cases do not hold that *any* decision by a governmental entity that involves land use or considers policy is legislative. "There are three general types of actions that local government agencies take in land use matters: legislative, adjudicative and ministerial. [Citations.] Legislative actions involve the enactment of general laws, standards or policies, such as general plans or zoning ordinances. [Citation.] Adjudicative actions— sometimes called quasi-judicial, quasi-adjudicative or administrative actions—involve discretionary decisions in which legislative laws are applied to specific development projects; examples include approvals for zoning permits and tentative subdivision maps. [Citation.] Ministerial actions involve nondiscretionary decisions based only on fixed and objective standards, not subjective judgment; an example is the issuance of a typical,

15

small-scale building permit.  [Citations.]"  (*Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 622.)

The act contemplated here is not a zoning ordinance.  It concerns land use, and takes policy matters into consideration, but so do such adjudicative matters as subdivision map approvals and variances.  Such factors do not make the Governor's concurrence a legislative act any more than they make it an adjudicative act.

3.  Tax Policy

The Auburn Tribe also argues the Governor's concurrence changed the tax base for the property, that this amounted to setting tax policy, and that as such it was a solely legislative act.  In support of this argument, the Auburn Tribe cites *Jackson & Perkins Co. v. Stanislaus County Board of Supervisors* (1959) 168 Cal.App.2d 559, which held that rose plants cultivated for sale were not exempt from ad valorem tax pursuant to a constitutional exemption for growing crops.  In so holding, the court noted that what is and is not to be taxed is a matter of legislative policy.  (*Id.* at p. 564.)

The Auburn Tribe also cites *Cullinan v. McColgan* (1947) 80 Cal.App.2d 976, which involved the construction of an income tax statute.  The California Personal Income Tax Act was passed and first became effective in 1935.  (*Id.* at p. 978.)  The act provided that income be computed on the basis of the taxpayer's annual accounting period.  (*Id.* at p. 977.)  The tax commissioner promulgated a regulation stating that income accrued prior to January 1, 1935, was not taxable and need not be reported.  (*Id.* at pp. 977-978.)  The court found no justification in the statute for this interpretation.  For this reason, the court held that the commissioner's rule amounted to legislative action by the commissioner.  (*Id.* at p. 981.)

The Governor's concurrence does not broadly set tax policy for the state.  The concurrence is unlike a tax statute that determines on a statewide basis what property is and is not to be taxed.  Moreover, as the Governor points out, the Secretary has the authority to take the land into trust for an Indian tribe, which would remove the property

16

from the tax base, whether or not the Governor concurs. "The Secretary of the Interior is . . . authorized, in his discretion, to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians. [¶] . . . [¶] Title to any lands or rights acquired . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." (25 U.S.C. § 5108.)

We also take issue with the Auburn Tribe's premise that policy decisions are inherently legislative. "The Legislature is charged, among other things, with 'mak[ing] law . . . by statute.' (Cal. Const., art. IV, § 8, subd. (b).) This essential function embraces the far-reaching power to weigh competing interests and determine social policy." (*People v. Bunn* (2002) 27 Cal.4th 1, 14-15.) But it is much too simplistic to say that every policy decision must be a legislative act. Every governmental decision that involves a weighing of policy is not a legislative act. "Executive action that has utterly no policymaking component is rare . . . ." (*Printz v. United States* (1997) 521 U.S. 898, 927 [138 L.Ed.2d 914, 939].) Making a policy determination is a core legislative function only insofar as it is part of the process of enacting law. When the Governor concurs with the Secretary's determination, he is not enacting land use or tax law. As we explain, he is implementing a legislatively-formulated gaming policy.

4. Concurrence Has Executive Characteristics

The act of concurring, the act at issue here, is in the nature of an executive act because it involves the implementation of California's existing Indian gaming policy. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States* (7th Cir. 2004) 367 F.3d 650, 664-665 (*Lac Courte*), cited by the trial court, makes this point, and is persuasive authority. There, in the face of the Wisconsin governor's refusal to concur with the Secretary's finding that taking the property into trust for gaming would not be detrimental to the surrounding community, the tribes claimed the gubernatorial concurrence provision of section 2719(b)(1)(A) of title 25 of the United States Code was

17

an unconstitutional violation of Wisconsin's separation of powers principle because it allowed the governor to enact public policy regarding gaming, which was legislative in character. (*Lac Courte,* at p. 664.) The court disagreed.

*Lac Courte* held that the Wisconsin constitution and statutes had already implemented a "fairly complex gaming policy." (*Lac Courte, supra*, 367 F.3d at p. 664.) The gaming policy noted by the court was the state-operated lottery, and "bingo and raffle games operated by 'religious, charitable, service, fraternal or veterans' organizations,' and pari-mutuel wagering and on-track betting." (*Ibid.*) Thus, when the governor considered the Secretary's request for concurrence, he was "informed by the public policy represented by the Wisconsin Constitution and relevant statutes." (*Ibid.*) The court stated that "the Governor's decision regarding any particular proposal is not analogous to creating Wisconsin's gaming policy wholesale—a legislative function—but rather is typical of the executive's responsibility to render decisions based on existing policy." (*Ibid.*) The governor's decision was consistent with the Wisconsin Constitution, which vested executive functions in the governor. (*Id.* at pp. 664-665.)

Likewise here, the Governor's concurrence did not create California's tax, land use, or gaming policy. Instead, the Governor was informed by these policies when he made his decision.

The Auburn Tribe attempts to distinguish *Lac Courte* because it relied on Wisconsin's existing gaming policy, whereas California has no existing policy with respect to gaming on post-1988 tribal land. We see no such limitation in *Lac Courte*. It, too, involved the governor's authority to concur with a decision on post-1988 tribal land gaming, but the opinion discussed no prior post-1988 tribal land gaming policy, only Wisconsin's policy to allow bingo games and track races. In fact, the court noted that casino gambling was not permitted in Wisconsin. (*Lac Courte, supra*, 367 F.3d at p. 664.)

18

California, like Wisconsin, has a fairly detailed statutory scheme governing Indian gaming. In addition to article IV, section 19 of the state Constitution and Government Code section 12012.5, subdivision (d), California law contains numerous statutes ratifying compacts under various terms, as well as the creation of the Indian Gaming Revenue Sharing Trust Fund, the Indian Gaming Special Distribution Fund, and the Tribal Nation Grant Fund. (Gov. Code, §§ 12012.5-12012.95.) Accordingly, by concurring, the Governor is merely implementing the gaming policy already legislatively formulated, and this is an executive function.[3]

_____

[3] The Auburn Tribe argues the trial court was wrong when it found that the Governor's power to concur was "ancillary and incidental to his power to negotiate and execute compacts." Specifically, the trial court found: "the Governor simultaneously issued the concurrence and executed a compact for Class III gaming. The Governor's concurrence was necessary and incidental to compact negotiations, as Class III gaming could not occur on the Yuba Site without the Governor's concurrence, and without a compact. . . . [¶] Thus, the Court finds that the Governor's concurrence was necessary and incidental to his powers to negotiate and execute a Class III gaming compact, as permitted by the California Constitution. The Governor did not violate California's separations of powers doctrine by issuing his concurrence."

We need not reach this issue since we have concluded that the power to concur was executive, rather than strictly legislative, and that by exercising the power the Governor did not violate the separation of powers clause of the state Constitution.

Just prior to oral argument, the Auburn Tribe requested we take judicial notice of several documents that were not in existence at the time of briefing, and which the Auburn Tribe claims support its argument that the Governor's authority to concur is not incidental to, but rather is separate and apart from his authority to negotiate and execute compacts with Indian tribes. The documents consist of letters from the office of the Secretary to the tribal chairpersons attaching "Secretarial Procedures" for the conduct of class III gaming on post-1988 tribal lands, both on the land at issue here and on land where another gaming facility is proposed. The Auburn Tribe submitted this material to show that the Governor's authority to concur is not a power that is incidental to his authority to conclude compacts, since concurrence may occur without compacting. Since we do not reach the issue of whether the authority to concur is incidental to the authority to compact, the documents are not material to our determination, and we deny the

19

C. Negotiating Before Land was Taken Into Trust

Section 19, subdivision (f) of article IV of the California Constitution provides: "Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts." The Auburn Tribe argues the Governor exceeded his authority because he negotiated the compact with the Enterprise Tribe *before* the land became Indian land.

The Auburn Tribe's reading of the provision is too narrow. The Governor did not negotiate a compact for the conduct of gaming on non-Indian land. The gaming would occur, and could only occur, if the land became Indian land. Thus, the gaming would be conducted on Indian land, just as the state Constitution provides. The Constitution does not specify when the negotiations may occur, only that whatever gaming is permitted must be conducted on Indian lands. The timing of the negotiations did not exceed the Governor's power.

II
CEQA

CEQA applies "to discretionary projects proposed to be carried out or approved by public agencies . . . ." (Pub. Res. Code, § 21080, subd. (a).) A project for CEQA purposes is defined as an activity that is: (1) directly undertaken by a public agency, (2) "undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies,"

---

requests for judicial notice. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)

20

or (3) "an activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Res. Code, § 21065.) As is apparent from these statutes, CEQA does not apply to a project unless it is undertaken by, supported by, or approved by a public agency. A public agency is defined in the code as including "any state agency, board, or commission, any county, city and county, city, regional agency, public district, redevelopment agency, or other political subdivision." (Pub. Res. Code, § 21063.)

The Auburn Tribe argues the Governor's concurrence was a project, and the Governor is a public agency. The Auburn Tribe recognizes that unless a public agency issues the permit or entitlement, the action is not considered a project for CEQA purposes. We considered and rejected the Auburn Tribe's claim that the Governor is a public agency in *Picayune Rancheria of Chukchansi Indians v. Brown* (2014) 229 Cal.App.4th 1416. We concluded that even though the definition of a public agency in section 21063 of the Public Resources Code is not exclusive, "[t]he specific examples included in *CEQA section 21063* are all, in common parlance, governmental *bodies,* rather than governmental *officials* like the Governor. . . . Thus, despite the statute's inclusive nature, there is nothing in the explicit language of *CEQA section 21063* that suggests the Legislature intended to encompass the Governor within the term 'public agency' as defined in that statute." (*Picayune*, at p. 1423.)

For the reasons stated in *Picayune*, we conclude the Governor's concurrence was not a project for CEQA purposes because the Governor is not a public agency.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

/s/

Blease, Acting P. J.

We concur:

/s/

Hull, J.

/s/

Butz, J.