DETJEN, J.,
Concurring and Dissenting.—I join in the disposition as stated in the lead opinion. The trial court erred in sustaining the demurrers. I do not, however, think the analysis reaches the question of whether the Governor has “concurring” authority because, on the facts of this case, he could not exercise the limited authority to compact granted to him by article IV, section 19, subdivision (1) of the California Constitution (added by Prop. 1A, eff. Mar. 7, 2000).
This case arises from a complicated interplay between the federal law governing the acquisition and use of lands held in trust for Indian tribes, and *706 the federal and state interests in regulating such land when used for gambling and related gaming activities. The parties[1] initially briefed and argued a difficult question in this arena—whether, in order to execute the express constitutional authority to negotiate and conclude gaming compacts granted under Proposition 1A, the Governor has been implicitly granted the power to concur in the United States Secretary of the Interior’s (Secretary) determination that it would be in the best interest of the tribe and its citizens, and not detrimental to the surrounding community, to permit gaming on Indian lands. Upon our request, the parties submitted supplemental briefing on five questions, including whether “the failure of the 305-acre parcel to be ‘Indian lands’ prior to the time the Governor negotiated and executed the compact deprive [d] him of the authority to negotiate and execute the compact when he did” (italics omitted) and whether the voters’ defeat of the compact ratification or the recent approval of substitute procedures for gaming by the United States Department of the Interior affected this case.
Justice Smith opines state authority authorizing the Governor to concur most likely exists by implication in the language of Proposition 1A that authorizes the Governor to negotiate and execute tribal-state compacts. He concludes however that, since California voters vetoed the tribal-state compact through Proposition 48 in the November 4, 2014, General Election, the express power from which the power of concurrence could be implied no longer exists. An implied concurrence power, the analysis goes, cannot be exercised when the compact no longer exists. (Lead opn. of Smith, J., ante at pp. 698, 704.)
Justice Franson concludes no state authority authorizes the Governor to concur; it is neither stated in nor implied from Proposition 1A.[2] He opines an *707 implied grant of that power is not necessary under the principles of California law. He does not believe the authority can be found in general executive power.
In arguing the issues, the parties initially assumed the Governor was appropriately exercising the authority granted under Proposition 1A to negotiate gaming compacts in the first instance. In the supplemental briefing, appellants asserted the Governor lacked authority to compact in the first instance. Due to the unique structure of California’s constitutional provisions regarding casino-style gaming, I believe this later position is correct.
OVERVIEW OF THE RELEVANT LAW
“The Indian Reorganization Act . . . authorizes the Secretary ... to acquire land and hold it in trust ‘for the purpose of providing land for Indians.’ ” (Carcieri v. Salazar (2009) 555 U.S. 379, 381-382 [172 L.Ed.2d 791, 129 S.Ct. 1058].) The operative statute for this authority is 25 United States Code section 5108 (formerly 25 U.S.C. §465), which provides that the “Secretary . . . is . . . authorized, in his [or her] discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments[,] whether the allottee be living or deceased, for the purpose of providing land for Indians.”
As with many federal laws, there are additional federal regulations delineating how this authority will be exercised. In the case of accepting land into trust, these regulations are detailed at 25 Code of Federal Regulations parts 151.1 through 151.15 (2016). Under 25 Code of Federal Regulations part 151.3 (2016), “land may be acquired for a tribe in trust status” in three circumstances: (1) when the property is “located within the exterior boundaries of the tribe’s reservation or adjacent thereto, or within a tribal consolidation area”; (2) when “the tribe already owns an interest in the land”; or (3) when the Secretary “determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.” With respect to accepting off-reservation land offered into trust under the third basis, the Secretary is guided by 25 Code of Federal Regulations part *708 151.11 (2016), which lists several factors to consider, including the need of the tribe for the land, the purposes for which the land will be used, the impact on the state from removing the land from the tax rolls, potential conflicts of land use which may arise, the location of the land relative to state boundaries and the boundaries of the tribe’s reservation, and, in the case where land is being acquired for business purposes, the tribe’s plan specifying the anticipated economic benefits associated with the proposed use. (25 C.F.R. § 151.11(a)-(c) (2016) [incorporating 25 C.F.R. § 151.10(a)-(c) & (e)-(l) (2016)].)
Comparatively, the primary purpose of the IGRA is “to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.” (25 U.S.C. § 2702(1).) Generally, class III gaming activities “shall be lawful on Indian lands” only when they are authorized by the tribe and approved by the Chairman of the Indian Gaming Commission, “located in a State that permits such gaming for any purpose by any person, organization, or entity,” and “conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State.” (Id., § 2710(d)(1).) Under the IGRA, any tribe “having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact.” (25 U.S.C. § 2710(d)(3).) The IGRA specifically defines “ ‘Indian lands’ ” as all land within the limits of any Indian reservation and “any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power.” (25 U.S.C. § 2703(4).)
However, the IGRA excludes any land taken into trust after October 17, 1988, from being used for gaming purposes unless certain exceptions apply. (25 U.S.C. § 2719(a).) Relevant here, land taken into trust after October 17, 1988, which is not otherwise permitted to be used for gaming by the IGRA, may be converted to such use if “the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary’s determination.” (25 U.S.C. § 2719(b)(1)(A).)
Like the Indian Reorganization Act (IRA; 25 U.S.C. § 5101 et seq.), the IGRA is also the subject of multiple federal regulations. (25 C.F.R. §§ 292.1-292.26 (2016).) Relevant to this appeal, the regulations define the *709 phrase ‘“[n]ewly acquired lands” as ‘“land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988.” (25 C.F.R. § 292.2 (2016), italics omitted.) The regulations allow the Secretary to streamline the process for taking lands into trust for the purpose of allowing gaming to occur. The regulations demonstrate, however, that taking land into trust and allowing gaming to occur remain two separate processes. (See id., §§ 292.3(b) (2016) [‘“If the tribe seeks to game on newly acquired lands that require a land-into-trust application ... the tribe must submit a request for an opinion to the Office of Indian Gaming.”], 292.15 (2016) [‘“A tribe can apply for a Secretarial Determination under § 292.13 for land not yet held in trust at the same time that it applies under part 151 of this chapter to have the land taken into trust.”].) Indeed, if in these dual processes, the Secretary notices an intent to take the land into trust for gaming purposes, but the Governor of the affected state issues a written nonconcurrence, ‘“the Secretary will withdraw that notice pending a revised application for a non-gaming purpose” and the land will not be taken into trust. (Id., § 292.23(a)(2) (2016).) If the land is already in trust or otherwise under control of the tribe, the tribe ‘“may use the newly acquired lands only for non-gaming purposes.” (Id., § 292.23(a)(1) (2016).)
California’s Constitution generally bans what is categorized as class III gaming under the IGRA. (Cal. Const., art. IV, § 19, subd. (e) [‘“The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey.”].) As our Supreme Court explained: ‘“In 1984, the people of California amended our Constitution to state a fundamental public policy against the legalization in California of casino gambling of the sort then associated with Las Vegas and Atlantic City . . . .” (Hotel Employees & Restaurant Employees Internat. Union v. Davis (1999) 21 Cal.4th 585, 589 [88 Cal.Rptr.2d 56, 981 P.2d 990] (Hotel Employees).) This prohibition led to the downfall of the first attempt to permit class III gaming on Indian land in California: Proposition 5. That proposition, which attempted to grant a statutory procedure for authorizing gaming on Indian lands, was held invalid[3] in the face of California’s constitutional ban on casinos. (Hotel Employees, supra, 21 Cal.4th at p. 615.) In response, the California Constitution was amended through Proposition 1A.
Proposition 1A added article IV, section 19, subdivision (1), to the California Constitution: “Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage *710 card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.”
DISCUSSION
The core issue in this case is the effect of Proposition 1A. The parties and my colleagues appear to agree that, if no state authority grants the Governor power to concur in the Secretary’s determination, then the Governor has no authority to concur. (See Confederated Tribes of Siletz Indians v. U. S. (9th Cir. 1997) 110 F.3d 688, 697-698 (Confederated Tribes) [noting the Governor acts under the authority of state law].)
My colleagues then split on whether the authority to concur in the Secretary’s determination that newly acquired land is suitable for gaming is implied from the Governor’s compacting authority under Proposition 1A, with the lead opinion avoiding the impact of that split by relying on a later revocation of the compact by voters. This analysis is one step too far down the road. Under the facts alleged in the complaint, appellants could state a legitimate claim that the Governor exceeded any constitutionally granted authority when concurring because, even if the power to concur was necessary to or implied within the authority to compact, the Governor was not properly executing the authority to compact.
Given that the Governor may only compact or concur if authorized under state law, a point discussed more fully, post, and that without authorization to act the California Constitution bars any conduct which would create Nevada- or New Jersey-style casinos, the meaning of the law defining the Governor’s authority is of paramount importance. (Hotel Employees, supra, 21 Cal.4th at p. 589; Confederated Tribes, supra, 110 F.3d at pp. 697-698.) The basic principles of statutory interpretation must therefore, in the first instance, be applied to the scope of the Governor’s authority under Proposition 1A.
I. Grammatical Structure of the Governor’s Compacting Authority.
Proposition 1A grants a narrow and specific constitutional authority, providing the Governor “is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in *711 accordance with federal law.” (Cal. Const., art. IV, § 19, subd. (f).) By applying some nonsubstantive simplifications,[4] the following sentence diagram can be generated:

This shows the Governor’s authority to negotiate compacts was substantially limited. The Governor’s compacting authority was limited in both the scope of gaming the compacts could grant, and the groups that could conduct that gaming, to “the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes” (Cal. Const., art. IV, § 19, subd. (f)), which corresponds roughly to the class III gaming permitted by the IGRA. It was also limited as to where the Governor could compact for that gaming to occur, namely “on Indian lands in California.” (Cal. Const., art. IV, § 19, subd. (f).) And it was limited such that the compacts and restrictions must be considered “in accordance with federal law.” (Ibid.) In this case, it is the restriction to compacting for operations on Indian lands which precludes the Governor’s actions under the alleged facts of this case.
II. The Meaning of “Indian lands” as Used in Proposition lA.
There is no direct definition of “Indian lands” in Proposition 1A. However, as is apparent from the general legal framework governing this issue, the proposition is readily understood to reference the IGRA through its specific *712 provisions, its reference to allowing gaming operations “in accordance with federal law,” and its enactment following the failure of Proposition 5. (See Flynt v. California Gambling Control Com. (2002) 104 Cal.App.4th 1125, 1132-1137 [129 Cal.Rptr.2d 167] [outlining the history of Indian gaming in California].) Indeed, the analysis by the Legislative Analyst for Proposition 1A preceded its explanation of how the changes proposed by Proposition 1A would affect gaming in California with a detailed explanation of how gaming regulations under the IGRA worked. Partially in light of this history, respondents concede that, in this appeal, “article IV, section 19, subdivision (f)’s plain meaning is to authorize the Governor to negotiate compacts for certain forms of otherwise illegal class III gaming to be conducted on Indian lands in California pursuant to IGRA.” As intervener puts it, the “history of Proposition 1A indicates that (1) the Governor may act ‘in accordance with federal law’ and (2) Indian tribes may conduct gaming on ‘Indian lands’ as that term is defined in IGRA
I agree with respondents that, given the history of Proposition 1A, the term “Indian lands” should be understood to have the same meaning as used in the IGRA. And, turning to the IGRA, there is, in fact, a definition of “Indian lands” to apply. As noted above, this definition covers all land within the limits of any Indian reservation and “any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power.” (25 U.S.C. § 2703(4).) Under this definition, the Governor’s authority under Proposition 1A is limited to compacting for gaming on lands held in trust by the United States and over which an Indian tribe exercises governmental power.
III. Proposition 1A is a Conditional Authorization of Authority.
Given that the Legislature faces a blanket constitutional prohibition on authorizing Nevada- and New Jersey-style casinos under article IV, section 19, subdivision (e), of the state Constitution subject only to a limited compacting authority delegated to the Governor for such gaming on trust lands pursuant to California Constution, article IV, section 19, subdivision (1), the notion that the Governor is vested with a broad authority to negotiate any compact which could ultimately result in gaming on later-created Indian lands (and has the concurring authority to enact those compacts) is difficult to defend. In support of this claim, respondents and intervener argue that a restriction on the Governor’s authority requiring the existence of “Indian lands” operates as an improper temporal limitation. As intervener further argues, the disputed provision “is a limitation on the content of compacts, not the time during which the Governor may negotiate and conclude the compacts.”
Although this argument generally contradicts the grammatical structure of the sentence which naturally reads such that the prepositional phrase “on *713 Indian lands” modifies ‘“for the operation” as opposed to ‘“compacts,” in the abstract one could argue, as respondents and intervener do, that the language is simply a limitation on where the operation of slot machines must ultimately occur and not a limitation on the Governor’s authority to act in the first instance. However, such an argument ignores a key component of statutory construction—the contested terms must be understood both in the context of the section as a whole and in its contemporary legal context. (Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson (2005) 545 U.S. 409, 415 [162 L.Ed.2d 390, 125 S.Ct. 2444] [explaining that ‘“[statutory language has meaning only in context”]; Stevens, The Shakespeare Canon of Statutory Construction (1992) 140 U.Pa. L.Rev. 1373, 1374, 1376, 1379 [describing the first three cannons of statutory interpretation as “ ‘Read the statute,’ ” “ ‘Read the entire statute,’ ” and ensure ‘“that the text be read in its contemporary context” (italics omitted)].)
In the broader context of article IV, section 19, subdivision (1) of the state Constitution is a limited authorization of authority carved out of a blanket prohibition. And in the broader social context, subdivision (1) was only enacted through Proposition 1A because other attempts to grant Indian tribes the authority to engage in gaming on Indian lands had been overturned by the California Supreme Court. Thus, the suggestion the Governor’s compacting authority is ever present, provided that what is negotiated satisfies the authorizing statute at the time of implementation, runs contrary to the broader section’s text and the contemporary purpose for enacting Proposition 1A. The disputed limitation on the Governor’s authority to act is not temporal but conditional.
In other words, the fact the Governor’s authority can only be exercised when the conditions triggering that authority are met is not a temporal restriction on an existing authority. Like other conditional powers, the Governor’s authority only exists upon satisfying the condition needed to bring the right to act into existence. (Cf. Board of Trustees of Univ. of Ala. v. Garrett (2001) 531 U.S. 356, 374 [148 L.Ed.2d 866, 121 S.Ct. 955] [‘“Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation.”]; City of Boerne v. Flores (1997) 521 U.S. 507, 517-520 [138 L.Ed.2d 624, 117 S.Ct. 2157] [positive grant of legislative power to enforce 14th Amend, cannot be exercised unless record shows Congress is acting within that power by passing appropriate legislation]; see Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. U.S. (7th Cir. 2004) 367 F.3d 650, 656-657 (Lac Courte Oreilles) [explaining how the IGRA is a conditional statute, where the authority to act requires certain factual predicates to exist before *714 the Secretary may proceed (i.e.—the Secretary could not agree to take land into trust on the assumption that, by the time the act was complete, the Governor would concur)].) As an example, picture a pet-sitting business. Assume a client says to the business, “You may take my dog for a walk on the sidewalk.” The most natural reading of this command is that the business is not permitted to take the dog for a walk unless that walk occurs on a sidewalk. If there is no sidewalk on which to walk, the business lacks authority to take the dog. If the business prepares for a walk, believing there is a sidewalk outside, it risks the possibility of being wrong and thus lacking authority to take the dog on a walk. And if the business nonetheless proceeds to take the dog on a walk, expecting a sidewalk to appear around the corner, the business has begun the walk without authority. Here too, while the Governor may wish to proceed with a compact, expecting Indian lands to appear prior to any gaming occurring, the Governor will be acting without authority at all times there are no Indian lands because the condition necessary to trigger the Governor’s authority to compact has not arisen.
IV. On the Facts Pled, the Governor Could Not Exercise Elis Compacting Authority.
Having determined the initial limits of the Governor’s compacting authority under Proposition 1A, the question becomes whether the complaint “has stated a cause of action under any legal theory.” (Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist. (2003) 113 Cal.App.4th 597, 603 [6 Cal.Rptr.3d 574].) The relevant facts, as set forth throughout the first amended complaint, are as follows:
On March 1, 2005, intervener applied to have “the Madera [s]ite taken into trust for the purposes of conducting class III gaming.” By letter dated September 1, 2011, the Assistant Secretary for Indian Affairs noted a favorable determination under the two-part analysis required by 25 United States Code section 2719 had been reached and requested the Governor concur. On August 31, 2012, the Governor responded by letter, concurring. When the Governor issued this concurrence letter, “he also announced that he had already negotiated a Compact with the Tribe.” The complaint then alleges the Governor’s concurrence “exceeded his authority under state law.”
Although the focus of the complaint is clearly on the Governor’s power to concur, the facts detailed above are sufficient to demonstrate the Governor exceeded the authority granted under state law as alleged. This is so because the Governor was alleged to have negotiated a compact for gaming on lands *715 that were not “Indian lands.”[5] At the time the Governor negotiated the compact and gave the disputed concurrence, the Secretary had not accepted the Madera property into trust under the only authority permitting such conduct, 25 United States Code section 5108. Without this acceptance, the land cannot be considered as held in trust by the United States. (25 C.F.R. § 151.3 (2016) [“No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary.”].) Because the land was not held in trust at the time the Governor negotiated the announced compact, the Governor was not negotiating a compact for gaming on Indian lands and, thus, exceeded any authority granted by Proposition 1A.
V. The Parties’ Framing of this Issue.
The parties have framed this issue in the context of the Governor’s power to concur in light of the constitutional power to compact, disputing whether such power would grant the Governor the ability to take lands from California for Indian use, thereby usurping the Legislature’s role in setting public policy and resolving land use issues. As appellants argued, the “primary issue in this appeal is whether the Governor has authority to authorize the Secretary to create new Indian land in California for the purposes of gaming by concurring in the Secretary’s two-part determination.” While respondents generally worked to rebut appellants’ claims, they too suggested authorization in the Governor to concur in the taking of lands into trust under the IGRA, writing: “When a tribe seeks a compact for gaming on Indian lands that are not taken into trust through the Secretary’s powers under 25 [United States Code section] 2719(b)(1)(A), a gubernatorial concurrence is not required.” It further directed the issue to this point by arguing that “[a]s long as Indian lands are established ‘in accordance with federal law,’ meaning IGRA, those lands become eligible for gaming.”[6]
*716 I agree with the general idea that the historical exclusion of casino gaming in California coupled with the history of Proposition 1A would not inform a voter that Proposition 1A was granting to the Governor the concurring authority to convert non-Indian land to Indian land in a manner which would authorize Nevada- or New Jersey-style casinos.
As the summary of the various laws and regulations shows, however, this framing misses the mark. There is no provision of law in the IGRA which permits the Secretary to take lands into trust. The trust determination is wholly driven by the provisions of the IRA. And, while regulations may allow both proceedings to progress in tandem, the authority to concur in a determination that “newly acquired lands” are suitable for gaming purposes in no way grants the Secretary a right to take the land into trust under the IRA. At most, such a concurrence would support the Secretary’s determination that taking the land into trust would benefit the tribe because gaming would not be blocked at a later date and, thus, the economic impacts of the decision would be clearer.
All parties appear to recognize this fact, at least implicitly, at some point in their briefing. For example, respondents explain in their summary of the law that while “the IRA governs federal action to take land into trust for Indian tribes, IGRA governs a federal decision to allow such trust land’s use” for gaming purposes. Likewise, intervener clearly explains that the IRA “governs the federal government’s acquisition of land for the benefit of Indian tribes” while the IGRA aims only to “facilitate ‘the operation of gaming by Indian tribes.’ ” This split in framing and understanding appears to arise from a conflict that may be unique to California and derives from California’s start and stop history in regulating Indian gaming.
In the federal regulatory scheme, the Secretary is permitted to conduct analyses with respect to the suitability of gaming on “newly acquired lands.” (25 U.S.C. § 2719(b)(1)(A); 25 C.F.R. §292.13 (2016).) By regulatory definition, such lands include not only those already held in trust, but also those that “will be taken” into trust. (25 C.F.R. § 292.2 (2016).) In contrast, California’s Proposition 1A arose in part as a mechanism to ratify several previously negotiated compacts. (California Commerce Casino, Inc. v. Schwarzenegger (2007) 146 Cal.App.4th 1406, 1412 [53 Cal.Rptr.3d 626].) In doing so, it approved the Governor’s prior unauthorized compacting, weakened the constitutional restriction on the Legislature’s authority to permit Nevada- and New Jersey-style casinos, and delegated compact power to the Governor, subject to ratification by the Legislature. As part of this change, Proposition 1A tightly limited the Governor’s future authority to compact such that he could only negotiate for gaming “on Indian lands.” (Cal. Const., art. IV, § 19, subd. (1).) In this way, California’s Constitution was *717 amended to grant the Governor a right to compact which covers only half of the potential proceedings occurring under the federal regulatory scheme.[7]
[8]
It must be noted that the Seventh Circuit, in Lac Courte Oreilles, supra, 367 F.3d at page 656, wrote, “Unless and until the appropriate governor issues a concurrence, the Secretary of the Interior has no authority under [25 United States Code section] 2719(b)(1)(A) to take land into trust for the benefit of an Indian tribe for the purpose of the operation of a gaming establishment.” While this statement would appear to contradict the prior analysis, I find it distinguishable on at least three grounds.
First, the issue under consideration in Lac Courte Oreilles was whether the IGRA’s concurrence provision was an unconstitutional violation of the separation of powers doctrine. (Lac Courte Oreilles, supra, 367 F.3d at p. 655.) The court’s understanding of the basis for invoking the request for concurrence, as authority to take the land into trust or authority to permit gaming on newly acquired land, was therefore immaterial to the resolution, rendering this analysis dicta. Indeed, the court used the above statement in order to analogize the legislation to other examples of “contingent legislation” which had been held constitutional. (Id. at p. 656.)
Second, the factual scenario considered in Lac Courte Oreilles was different in a material way. In Lac Courte Oreilles, the Governor of Wisconsin had declined to concur in the Secretary’s findings, precluding the requested authorization for gaming and triggering a dispute concerning the Governor’s authority to affect federal law. (Lac Courte Oreilles, supra, 367 F.3d at p. 653.) As such there was no detailed discussion of Wisconsin’s laws or policies with respect to the Governor’s authority to act. In contrast, here the *718 Governor concurred with the Secretary, triggering a different dispute concerning whether, under California law, the Governor had the authority to issue that concurrence.
Finally, and most importantly, the court’s statement in Lac Courte Oreilles is not accurate. There is no technical reason under the law, provided the proper Administrative Procedure Act (APA) requirements are met, that the Secretary could not take land into trust for the purpose of gaming without the Governor’s concurrence.[9] This is so because the authority to act arises under 25 United States Code section 5108 and not 25 United States Code section 2719. Should the Secretary so act and survive the likely challenge under the APA, however, 25 United States Code section 2719 would still bar class II or III gaming on the property unless and until an exception applied—such as the Governor’s concurrence provision. Thus, in the context of a dispute arising when a request for a trust determination was made under 25 United States Code section 5108 at the same time as a request for a determination that the newly acquired property is suitable for gaming under 25 United States Code section 2719, it would be understandable, though not wholly correct, to claim the property could not be taken into trust for the purpose of gaming unless the Governor concurred. To the extent Lac Courte Oreilles suggests the Governor’s concurrence is required to take land into trust, I do not find it persuasive authority.
VI. The Governor’s Executive Authority.
The Governor’s concurrence could still be accepted as valid in this case if the Governor held the authority to concur as a power inherent to the chief executive of the state. I concur with and join Justice Franson’s conclusion that no such authority exists. I find persuasive his analysis showing that the California Constitution expressly bans the creation of Nevada- or New Jersey-style casinos. (Cal. Const., art. IV, § 19, subd. (e).)
This general prohibition demonstrates forcefully that the Governor does not possess the power to act in a manner which would result in the authorization to operate Nevada- or New Jersey-style casinos within California absent some express grant of that right. While it is true the Governor’s concurrence does not, by itself, create permission to operate such casinos in California, that authority being expressly found only in the Secretary, there can be no doubt *719 the practical effect is the same. (See Lac Courte Oreilles, supra, 367 F.3d at p. 663 [rejecting argument that impact of gubernatorial inaction violated federalism principles because federal government could grant states input into execution of federal law]; Confederated Tribes, supra, 110 F.3d at p. 698 [noting that Secretary must comply with guidelines expressed by Congress and that governor plays limited role by concurring once the Secretary has determined gaming would be appropriate].) At the time the Secretary requests concurrence, a preliminary determination that operation of class III gaming on the identified lands is appropriate has already been reached. (See 25 C.F.R. § 292.13 (2016); Lac Courte Oreilles, supra, 367 F.3d at p. 663 [explaining that due to the transparent nature of the IGRA, “if the Secretary of the Interior issues a favorable finding, but ultimately denies the application, the constituents will gather that the governor likely declined to issue a concurrence”].) Given that the California Constitution expressly forbids the authorization of such gaming, and that the exception created by Proposition 1A only applies to “Indian lands,” there can be no inherent authority in the Governor to concur in the conclusion that gaming may occur on “newly acquired lands” which are not already in trust.[10]
I also find this constitutional prohibition is confirmation that the underlying authority to concur in the Secretary’s determination to authorize Nevada- or New Jersey-style casinos on newly acquired lands is inherently and wholly legislative. By expressly removing the authority to authorize Nevada- and New Jersey-style casinos from within the broad plenary powers of the Legislature, then placing partial authority to compact for such casinos with the Governor, subject to express ratification from the Legislature, the California Constitution leaves no doubt that the authority to authorize such casinos cannot exist within the Governor’s inherent executive authority. During our consideration of this case, another Court of Appeal reached a contradictory result in United Auburn Indian Community of Auburn Rancheria v. Brown (2016) 4 Cal.App.5th 36 [208 Cal.Rptr.3d 487] (United Auburn). United Auburn reviewed three general legislative spheres and found the Governor’s concurring power did not fall exclusively within any of those three. (Id. at pp. 47-51.) Then, relying on Lac Courte Oreilles, the court determined the concurring power had some “[e]xecutive [c]haracteristics,” while failing to expressly call it an executive power, because it allegedly involves the *720 implementation of existing Indian gaming policy in California. (United Auburn, supra, 4 Cal.App.5th at pp. 51-52, italics omitted.) I am not persuaded by this analysis.
As the court in United Auburn noted, case law in California stands “for the unremarkable proposition that the Governor may not exercise a legislative power without express authority from the Legislature.” (United Auburn, supra, 4 Cal.App.5th at p. 47.) California’s constitutional ban on the legislative authority to authorize gaming and the later amendment granting limited powers to the Governor in that context demonstrates forcefully that this proposition is the controlling law. Yet, United Auburn makes no reference to this history or its implication.
Similarly, United Auburn’s reliance on Lac Courte Oreilles to conclude concurring has an executive characteristic under California law is misplaced. As United Auburn noted, Lac Courte Oreilles found extensive gaming regulations in Wisconsin meant there was a general policy, consistent with the Wisconsin Constitution, which the Governor was simply enforcing. (United Auburn, supra, 4 Cal.App.5th at pp. 51-52.) Lac Courte Oreilles conducted its analysis by following an earlier United States Supreme Court case considering California’s authorization of bingo. In that case, California v. Cabazon Band of Mission Indians (1987) 480 U.S. 202 [94 L.Ed.2d 244, 107 S.Ct. 1083] (Cabazon), the Supreme Court noted that California allowed several forms of gambling to occur, including bingo and the card games being operated by the tribe, but had sought to criminalize high stakes, unregulated bingo. (Id. at p. 211.) In the context of these facts, the Supreme Court found “California regulates rather than prohibits gambling in general and bingo in particular” and, thus, could not enforce its stricter bingo regulations on reservations. (Id. at pp. 211-212.)
In contrast to both Lac Courte Oreilles and Cabazon, there is no regulation of Nevada- and New Jersey-style gaming under California law generally. Rather, the general rule is a constitutional prohibition on such actions. As such, if not for Proposition 1A, there would be no doubt that California prohibited rather than regulated such gaming and, thus, the Governor could exercise no executive authority in this area. (See Artichoke Joe’s California Grand Casino v. Norton (9th Cir. 2003) 353 F.3d 712, 721 [noting that post-Cabazon “the general criminal jurisdiction that California exercises under Public Law No. 280 allowed California to prohibit gaming for Indian tribes, if the scheme was prohibitory rather than regulatory”].) Yet, in the face of federal regulations permitting gambling on Indian lands, California has granted a limited exception to this general prohibition which permits Nevada- and New Jersey-style gaming operations on land already taken from the state to benefit Indian tribes. Such a limited exception to the general prohibition *721 cannot be understood as a switch from prohibition to regulation given the broader constitutional ban. Indeed, on the federal side of the analysis, California’s grant of limited gaming rights is generally not considered to invoke a broader grant of all gaming rights under federal law. (Rumsey Indian Rancheria of Wintun Indians v. Wilson (9th Cir. 1994) 64 F.3d 1250, 1258 [“IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming .... In other words, a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have.” (fn. omitted)].) California has determined not only that the ability to authorize Nevada- and New Jersey-style casinos is a legislative function, but has constitutionalized a general prohibition to such gaming activities subject to a single regulatory exception available where the land in question is “Indian land” and thus not subject to the general California constitutional prohibition. This is not a basis for broad gubernatorial authority.
VII. Remaining Issues.
I concur and join in Justice Smith’s determination the claims against certain respondents, the Attorney General, the California Gambling Control Commission, the Bureau of Gambling Control and the State of California are not moot for the reasons he states.
I do not join in the guidance asserted in section VII of Justice Franson’s opinion. I take no position on how the differing views in our opinions should affect further proceedings upon remand. The issues are complex and intertwined with federal law.[11] The parties and the trial court are in the best position to work through the import of our disposition.
VIII. Conclusion.
In summary, I conclude the demurrers should have been overruled. Constitutional authority to negotiate a tribal-state compact authorizing class III *722 gaming requires that the land at issue be Indian land. At the time of this tribal-state compact, the 305-acre parcel in Madera was not Indian land. On the facts pled by appellants, the Governor exceeded his constitutional authority.

 The parties are plaintiffs and appellants. Stand Up for California! and Barbara Leach (collectively, appellants); defendants and respondents. State of California, the Governor of California, the Attorney General of California, California Gambling Control Commission, and Bureau of Gambling Control (collectively, respondents); and intervener and respondent. North Fork Ranchería of Mono Indians (intervener).

 Justice Franson’s concurrence and dissent attempts to completely resolve the scope of the Governor’s concurring power by claiming the average voter would not have understood Proposition 1A to resolve the controversial issue of off-reservation casinos. (Cone. & dis. opn. of Franson, J., post, at p. 723.) The issue before us is not so broad, being limited to whether the Governor has concurring power in the context of land not yet taken into trust. To the extent Justice Franson’s position is premised on the notion no power to concur could be intoned from Proposition 1A because the proposition did not affect off-reservation casinos, I disagree. The Indian Gaming Regulatory Act (IGRA; 18 U.S.C. §§ 1166-1167; 25 U.S.C. § 27 of et seq.) wholly bans class III gaming on Indian lands in states which do not permit such gaming “by any person, organization, or entity.” (25 U.S.C. § 2710(d)(1)(B).) As discussed, post, by passing Proposition 1A the voters opened California to gaming under the IGRA. Justice Franson’s recitation of the full scope of the IGRA’s gaming provisions shows this authorization resolved whether off-reservation casinos would be permitted on lands not subject to the concurrence provisions at issue here by allowing the Governor to compact for, and thus *707 approve, casinos on lands taken into trust at any time that are contiguous to the boundaries of Indian reservations; on lands taken as pail of a settlement of a land claim; on lands obtained through restoration; and on lands held by an Indian tribe or individual subject to restriction by the United States against alienation. (25 U.S.C. §§ 2703(4), 2719(a), (b).) In light of the limited scope of the alleged facts in this case, it is unnecessary to conclude Proposition 1A cannot support any form of concurring power, particularly in the context of lands held in trust for non-gaming purposes which would require a concurrence to permit future gaming. I take no position on that issue and therefore cannot agree with Justice Franson’s broader conclusions.

 With the exception of the final sentence of Government Code section 98005, not relevant here.

 These simplifications generally reduce the sentence to its nonredundant parts. In this process, the ratification clause is irrelevant to the issue at hand and can be completely eliminated. The “operation” and “conduct” phrases can be combined to simply authorize the operation of slot machines, as the remaining games are redundant with respect to the analysis. Likewise, “negotiate and conclude” can be expressed simply as “negotiate.” And the copular phrase “is authorized to” can be succinctly stated as the modal verb “may” without causing any harm to the section’s meaning. (Garner, Garner’s Modern English Usage (4th ed. 2016) pp. 113 [“Verb phrases containing be-verbs are often merely roundabout ways of saying something better said with a simple verb. ... [¶] ... [¶] Many such wordy constructions are more naturally phrased in the present-tense singular: ... is authorized to {may) . . . .”], 221 [defining copula as “(1) a linking verb, such as be, feel, or seem, that expresses a state of being rather than action; or (2) a link or connection in general”].)

 Further facts developed in the record show that the Secretary only took the Madera property into trust after receiving the Governor’s letter. As expected, it did so “pursuant to the [IRA], 25 [United States Code section 5108, formerly United States Code section] 465, and its implementing regulations at 25 [Code of Federal Regulations p]art 151 [.1 et seq.].” However, this fact did not necessarily need to be pled to state a cause of action, as the complaint directly alleged the Madera property was not in trust when the application was made and did not indicate it had gone into trust at any point prior to the Governor’s concurrence.

 To intervener’s credit, it generally kept the issues separate (despite wrongly claiming that 25 U.S.C. § 2703(4) defines “ ‘Indian lands’ ” to include “lands acquired through two-part determination”) contending “the Governor does not unilaterally make new policy or exercise plenary power to create new Indian land when concurring in the Secretary’s determination” while arguing the trial court correctly concluded “the California Constitution grants the Governor authority to concur in the Secretary of the Interior’s two-part determination to permit gaming on Indian lands acquired by the Secretary after 1988 . . . .” Intervener does not, however, explain how the Madera property qualified as “Indian lands” under the facts of this case.

 It appeal's appellants may have belatedly recognized this fact in their reply brief. There appellants complained respondents’ argument that the “concurrence was authorized because the concurrence is the mechanism under federal law by which the land in question here would become Indian land on which gaming could occur” was “circular,” explaining the “existence of Indian land on which gaming can occur is the precondition to the Governor’s authority to negotiate a compact pursuant to which such gaming on that land would be regulated.” Appellants, however, fully embraced this limitation in their supplemental briefing.

 I recognize that the interplay of the various regulatory schemes creates the potential for significant gubernatorial power over the placement of class III gaming facilities within California should the Governor have authority to concur once lands are Indian lands. While the Governor has no direct role in determining which lands are taken into trust, there appears to be no legal reason why the Secretary could not take lands into trust for the purpose of providing future revenue as a gaming location or other similar reason. Once the lands are in trust, the Governor would appear to have both the power to negotiate compacts under state law and the power to preclude gaming by withholding his necessary concurrence under federal law, thereby precluding gaming under a federal compact. Whether this was the desired outcome of the electorate when passing Proposition 1A is not before us. Regardless, it is the province of the Legislature to resolve any unintended consequences.

 This is particularly true if the land is taken into trust for class I gaming, which is not regulated by the IGRA and thus not subject to the post-1988 Indian land gaming prohibition. (See 25 U.S.C. §§ 2710(a)(1) [“Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this [a]ct."’], 2719(a) [“Except as provided in subsection (b), gaming regulated by this [a]ct shall not be conducted on lands acquired by the Secretary . . . .”].)

 Due to the expressly stated policy against such gaming, this is not a case, as intervener suggests, where the Governor is acting in the face of silence. The People of California amended the state Constitution in a manner that excludes any assertion of inherent authority and, indeed, respondents do not rely on this justification in their' own briefing. For similar reasons, I find intervener’s reliance on U.S. v. 1216.83 Acres of Land (1978) 89 Wn.2d 550 [574 P.2d 375, 379] misplaced. Unlike 1216.83 Acres of Land, where broad powers were granted to the governor to control the consenting agency and its policies, the policy outlined in California’s Constitution is directly opposed to the Governor’s conduct in this case, limiting his ability to act.

 I do not share Justice Franson’s concerns that an inability to negotiate prior to land becoming Indian lands “might be considered a violation of IGRA’s requirement for good faith negotiations.” (Cone. & dis. opn. of Franson, J., post, at p. 773, fn. 29.) Proposition 1A grants the Governor compacting authority over Indian lands. And the federal scheme does not mandate any negotiations until the land at issue is under tribal control (i.e., is Indian lands). (See 25 U.S.C. § 2710(d)(1 )(A)(i) [making class III gaming lawful only upon passage of ordinance by Indian tribe “having jurisdiction over such lands”]; (d)(3)(A) [requiring state to negotiate in good faith upon receipt of request from any “Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted”]; see also Citizens Against Casino Gambling v. Chauduri (2d Cir. 2015) 802 F.3d 267, 279 [“IGRA requires that any tribe seeking to conduct gaming on land must have jurisdiction over that land.”].)